**DAIMLERCHRYSLER CORPORA-
TION,** *f/k/a* **Chrysler Corpora-
tion, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 00–1518.**

United States Court of Appeals,
District of Columbia Circuit.

Argued March 5, 2002.

Decided May 7, 2002.

K.C. Hortop argued the cause for petitioner. On the briefs was Theodore R. Opperwall.

Christopher W. Young, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Margaret A. Gaines, Supervisory Attorney.

Before: EDWARDS and RANDOLPH, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In 1971, the National Labor Relations Board ("NLRB" or "Board") rendered its seminal decision in *Collyer Insulated Wire*, 192 N.L.R.B. 837 (1971). *Collyer* holds that when the parties to certain types of disputes have provided for arbitration in their collective bargaining agreement ("CBA") the Board will not pursue unfair labor practice proceedings until arbitration has run its course. Deferment under *Collyer* is appropriate only

when the CBA-provided arbitration offers an expeditious and fair means for resolution of the parties' dispute. *See id.* at 842. Under a closely related policy, the Board also defers to the results of arbitration, so long as the arbitral decision meets certain general criteria. *See Hammontree v. NLRB,* 925 F.2d 1486, 1491 (D.C.Cir.1991) (en banc) (discussing Board's deference policies).

*Collyer* is not without limits, however. Indeed, the scope of the *Collyer* doctrine has changed over the years as the Board has continued to shape a deferral policy that harmonizes private contractual rights emanating from CBAs and public statutory rights flowing from the National Labor Relations Act ("NLRA" or "Act"). *See* 1 THE DEVELOPING LABOR LAW 1378-90 (Patrick Hardin & John E. Higgins, Jr. Editors-in-Chief, 4th ed.2001). And in *Metropolitan Edison Co. v. NLRB,* 460 U.S. 693, 103 S.Ct. 1467, 75 L.Ed.2d 387 (1983), the Supreme Court indicated that certain statutory rights are not subject to contractual abrogation unless the aggrieved party has clearly and unmistakably waived the statutory rights at issue. *See also Wright v. Universal Mar. Serv. Corp.,* 525 U.S. 70, 79-80, 119 S.Ct. 391, 396–97, 142 L.Ed.2d 361 (1998).

■ An alleged refusal by an employer to furnish relevant information needed by a union for use in collective bargaining or grievance processing is a type of case that is not subject to *Collyer* deferment absent a clear and unmistakable waiver. Since at least 1984, the Board has consistently held that such disputes will not be deferred to arbitration. This policy is justified in part because the obligation to provide such information is derived from statutory duties independent of the labor contract, *NLRB v. Acme Indus. Co.,* 385 U.S. 432, 437, 87 S.Ct. 565, 568, 17 L.Ed.2d 495 (1967); *American Standard, Inc.,* 203 N.L.R.B.

1132 (1973), and in part because such information is essential to the union if it is to function effectively as the bargaining agent for unit employees, *Acme,* 385 U.S. at 435-36, 87 S.Ct. at 567-68. The Board has also declined to defer cases involving alleged refusals to furnish information for fear of fostering a "two-tiered arbitration process," in which parties first proceed to arbitration over information requests and then proceed to arbitration over the underlying grievances. *See United Technologies Corp.,* 274 N.L.R.B. 504, 505 (1985) (quoting *General Dynamics Corp.,* 268 N.L.R.B. 1432, 1432 n. 2 (1984)), *supplemented on other grounds by* 277 N.L.R.B. 584 (1985).

The instant case involves Daimler-Chrysler Corporation ("DC") and the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, Local 412, Unit 53, AFL-CIO (the "Union"). One of the Union's stewards at DC sought relevant information from DC in connection with employee grievances. When the information sought was not furnished to the satisfaction of the Union, an unfair labor practice ("ulp") charge was filed with the NLRB. The Board found that DC's refusal to provide the requested information violated the NLRA. *See DaimlerChrysler Corp.,* 331 N.L.R.B. No. 174, 2000 WL 1268770 (Aug. 25, 2000) ("*Order*"), at 1. DC requested that the Board decline to adjudicate the unfair labor practice charges and defer them to arbitration under the parties' CBA. The Board, however, adhered to its longstanding practice of refusing to defer disputes over requested information to the arbitration process. DC now asks this court to overturn the Board's policy. We decline. While the Board may in the future decide to reconsider the scope of the *Collyer* doctrine, this court has no authority on this record to second-guess the

Board's application of well established precedent.

One of the grievances for which the Union steward sought information involved an employee who was discharged pursuant to a "last-chance" agreement into which he had entered after being discharged a year earlier. Under established practices between DC and the Union, "last chance" agreements have no precedential value with regard to the treatment of other employees. Because of this practice, DC argues that it was not required to furnish information to the Union on such agreements. The Board held that the information could still be relevant to the Union in determining whether to process a grievance to arbitration. In light of the liberal, discovery-type standard that governs information requests, the Board did not err in requiring DC to furnish the information sought. Nor did the Board err in finding that DC committed an ulp when it threatened the Union's steward with disciplinary action, including possible discharge, if he continued to request information. Accordingly, we deny DC's petition for review and grant the Board's cross-application for enforcement.

## I. BACKGROUND

After reviewing the record in this case, we conclude that the Board's findings are supported by substantial evidence on the record as a whole. *See Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 461, 95 L.Ed. 456 (1951). What follows is a summary of the relevant facts found by the Board.

DC is a large automobile manufacturer employing more than 100,000 employees in the United States. In 1997, Keith Valentin was elected to be the chief steward at DC's plant in Auburn Hills, Michigan, which employs about 130 engineers represented by the Union. *Order* at 3-4; Br. of Petitioner at 5. This petition centers on a number of requests for information made by Mr. Valentin in his capacity as chief steward. DC furnished no information in response to the disputed requests.

Most of Mr. Valentin's requests were related to employee grievances. For example, between December 1997 and January 1998, he filed three grievances alleging that DC had violated the CBA by offering more overtime to transmission engineers than to engine engineers. He filed a request for information, seeking an alphabetical list of access badge swipes for all bargaining unit members for a period during 1997 and 1998, as well as lists of unit members on corporate shuttle flights to and from Indiana (where DC had another facility) for the same period. *Order* at 4-5. He also requested a list of overtime hours that were offered to the transmission engineers but not to the engine engineers, along with copies of the relevant time cards. Instead of providing the requested information, DC sent Mr. Valentin a memo requesting the relevance of the information to any active grievance, and expressing DC's "understanding" that the grievance had already been resolved. *Id.* at 5; Memorandum from Desirée Redenz to Keith Valentin (Apr. 20, 1998), *reprinted in* Joint Appendix ("J.A.") 149-51. Later, Mr. Valentin testified that the grievance had not been resolved to his satisfaction and that it was his understanding that he could appeal the grievance with information obtained through the information requests. *See* Transcript of Administrative Law Judge ("ALJ") Hearing ("Tr.") at 121, *reprinted in* J.A. 62. Mr. Valentin also filed information requests in connection with an engineer named Kareem Schkoor claiming discrimination in promotion. He also filed other requests related to other grievances. *Order* at 4-7 (detailing requests).

Many of Mr. Valentin's memoranda contained language that DC managers found objectionable. For instance, in May, Mr. Valentin sent a memorandum to DC's diversity manager regarding an ulp charge he had filed. Memorandum from Keith Valentin to Monica Emerson (May 6, 1998), *reprinted in* J.A. 169. He wrote: "As a matter of professional courtesy, I strongly recommend that you seek private legal counsel to protect your individual rights in the event that Corporate and individual agent (yourself) interests diverge." *Id.* Mr. Valentin also included the following sign-off, which is found at the end of many of his memoranda to DC management: "If you have any questions or concerns . . . contact me at your earliest convenience rather than feign confusion and ignorance at a later date." *Id.*

Particularly relevant to this appeal is a request Mr. Valentin made regarding so-called "last chance" data. In 1998, engineer Arthur Sibert was discharged for being absent from work. The Union filed a grievance in protest, which was denied at the initial steps of the grievance procedure. Mr. Sibert had been discharged by DC once before, in 1996, and had returned to work on a "last chance" basis. *Order* at 5-6. The Union and DC had agreed generally that matters resolved on a last chance basis could not be used in connection with the resolution of any other grievance. Tr. 48, *reprinted in* J.A. 45. In April 1998, Mr. Valentin requested information regarding all employees disciplined pursuant to a last chance agreement since 1993. *Order* at 6. DC refused to provide the information because of the agreement that such cases would not have any precedential value. *Id.* Mr. Valentin also filed grievances in connection with Mr. Sibert's initial 1996 discharge. Pursuant to those grievances, he requested records regarding, *inter alia*, Mr. Sibert's rights under

the Family and Medical Leave Act ("FLMA"). *Order* at 6.

In early May, DC gave Mr. Valentin a memorandum stating that most of his information requests and other communications were "inappropriate." Memorandum from Don Pentecost to Keith Valentin (May 6, 1998), *reprinted in* J.A. 163. The memorandum continued:

> We feel [these information requests have] been an attempt by you to harass, intimidate and create work rather than pursue any legitimate need for information. These letters are often sarcastic and demanding in tone, which we find totally unacceptable, counter productive [sic] to the resolution of grievance disputes and an abuse of the grievance procedure. Additionally your requests are either inappropriate, devoid of any apparent relevance, and/or over-burdening on the Corporation, and therefore the Corporation will not respond to any of your previous requests.

*Id.* The memorandum concluded by advising Mr. Valentin that "continuance of this type of inappropriate, harassing activity may result in disciplinary action being taken up to and including discharge." *Id.*

Following a two-day hearing, the ALJ found that DC had violated NLRA § 8(a)(1) by threatening Mr. Valentin with discharge for making further information requests. *Order* at 4. He also found that DC violated NLRA § 8(a)(5) by refusing to provide the requested information. The ALJ found, however, that DC had not violated the Act in refusing to provide information about employees who had been disciplined pursuant to last chance agreements, because such information was "irrelevant" to the Union's representational duties. *Id.* at 6. A three-judge panel of the Board unanimously adopted all of the ALJ's findings, except with regard to the last chance information. With one mem-

ber dissenting, the Board found that last chance information could, "at a minimum, be useful to the Union in deciding whether" it was worthwhile proceeding to arbitration on Mr. Sibert's grievance. *Id.* at 2. In dissent, Member Brame contended that the parties' agreement rendered last chance data irrelevant because it had no precedential weight. *Id.* at 2-3.

DC argued to the Board that resolution of the § 8(a)(5) allegations should be deferred to the parties' grievance and arbitration procedure. The Board, however, held that allegations involving an employer's refusal to furnish information are not deferrable. Order at 1 n.3 (citing *Clarkson Indus.*, 312 N.L.R.B. 349, 353 n. 21, 1993 WL 379855 (1993); *United Technologies Corp.*, 274 N.L.R.B. at 505).

## II. DISCUSSION

### A. *Challenges Regarding Employee Schkoor*

Following the ALJ's decision, DC filed exceptions to most of his findings. *See* Respondent's Exceptions to Administrative Law Judge's Decision and Recommended Order (July 2, 1999), *reprinted in* J.A. 202-08. DC failed, however, to except to five of the ALJ's findings regarding information requested in connection with employee Schkoor. Specifically, DC did not file exceptions to the ALJ's findings that DC violated the Act with respect to the following Union information requests: (1) a request in early March regarding the factors used in deciding to promote other engineers to the position that Schkoor had sought; (2) a March request for Schkoor's performance evaluations; (3) an April request regarding one of the employees hired for the position Schkoor had sought; (4) an April request regarding workplace diversity policies; and (5) an April request regarding other employees who allegedly had not received their performance evalua-

tions on time. *See* Order at 1 n.2, 5; Respondent's Exceptions, *reprinted in* J.A. 202-08.

The NLRA provides that "[n]o objection that has not been urged before the Board ... shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances." NLRA § 10(e), 29 U.S.C. § 160(e). DC argues that it excepted generally to the ALJ's alleged failure to consider whether DC was excused from complying with all of Mr. Valentin's requests on the grounds that he made the requests in bad faith. DC also objected to the ALJ's alleged failure to consider DC's assertion that all of the requests for information should be deferred to the parties' grievance and arbitration procedures. Reply Br. of Petitioner at 2-3. We need not decide whether these two general exceptions gave the Board adequate notice that DC intended to contest the violations surrounding Mr. Schkoor's grievances. Assuming *arguendo* that DC adequately challenged the findings before the Board, we reject both of DC's general exceptions on the merits, as explained *infra*.

### B. *The Unfair Labor Practices*

This court's role in reviewing the Board's findings is limited. *See Tasty Baking Co. v. NLRB*, 254 F.3d 114, 123-24 (D.C.Cir.2001). We must uphold the Board's findings of fact as long as they are supported by substantial evidence in the record, considered as a whole. *Id.*; NLRA § 10(e), 29 U.S.C. § 160(e). The NLRA requires employers to bargain collectively with the employees' lawfully designated bargaining agent. NLRA § 8(a)(5), 29 U.S.C. § 158(a)(5). The duty to bargain includes the obligation to provide information that a union needs in order to perform its duties in grievance

processing and collective bargaining nego- tiations. *See Acme*, 385 U.S. at 435-37, 87 S.Ct. at 567-68. This includes information relevant to the processing of existing grievances and the investigation of poten- tial grievances. *See id.* at 437-38, 87 S.Ct. at 568-69. While the information must be relevant, "the threshold for relevance is low." *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1191 (D.C.Cir.2000). The Supreme Court has described the rel- evance standard as a liberal, "discovery- type" standard. *Acme*, 385 U.S. at 437, 87 S.Ct. at 568. Moreover, "[i]nformation re- lated to the wages, benefits, hours, [and] working conditions" of unit employees is presumptively relevant. *Country Ford Trucks*, 229 F.3d at 1191. Other informa- tion must also be furnished if the union can show that it is relevant to the perfor- mance of its duties. *See Local 13, Detroit Newspaper Printing & Graphic Commu- nications Union v. NLRB*, 598 F.2d 267, 271 n. 5 (D.C.Cir.1979).

■ In this case, the requested infor- mation pertained to employee grievances and was limited by the Board to informa- tion regarding bargaining unit employees. The requests concerned disputes over the allocation of overtime, an employee who was discharged, an employee who was de- nied promotion, and other appropriate sub- jects of representation. DC did not pro- vide any of the requested information, so it clearly violated the Act.

DC now argues that many of the re- quests were overly broad. DC did not raise this complaint with the Union at the time when the requests were made, howev- er. Nor did it respond to the requests in part. Thus, as the Board found, its belat- ed objection rings false. *See Country Ford Trucks*, 229 F.3d at 1192 ("Even accepting, for the sake of argument, that the Union's request was over-broad, this does not excuse the Company from provid-

ing the requested information to which the Union had an undisputed right.").

■ DC also argues that Mr. Va- lentin's requests were made in bad faith, so it was under no obligation to respond to any of them. This argument fails. First, nothing in the text or context of his requests indicates bad faith. All of the requests related to what appear to be legitimate grievances or potential griev- ances. The Board presumes that re- quests for presumptively relevant infor- mation are made in good faith, until the company demonstrates otherwise. *See id.*; *Columbia Univ.*, 298 N.L.R.B. 941, 945 (1990). While Mr. Valentin's memo- randa contained unusual language (in- structing recipients not to "feign ... ig- norance," for example), they were not worded so offensively as to justify ignor- ing them entirely.

■ Moreover, DC's arguments that particular requests were made in bad faith do not withstand scrutiny. For example, DC argues that Mr. Valentin's request for FMLA information regarding employee Si- bert was made in bad faith, because the only issue the Union was pursuing regard- ing Mr. Sibert's termination was whether he had a legitimate justification for failing to appear for work on the day in question. DC ignores the fact that Mr. Valentin sought the information in connection with new grievances he had filed concerning Mr. Sibert's initial 1996 termination. *See* Order at 6. The Board found the FMLA information to be presumptively relevant to the grievance Mr. Valentin had filed. Thus, the argument that the request was made in bad faith fails.

■ Finally, DC argues that it was not required to provide the last chance data, because of the Union's agreement that res- olution of last chance matters would not have precedential value. As the majority

of the Board panel noted, the information could nonetheless prove useful to the Union "in deciding whether even to proceed to arbitration on Sibert's grievance." Order at 2 (citing, *inter alia, United States Postal Serv.,* 308 N.L.R.B. 547, 549 (1992)). In other words, the Board found that the Union could use the information as a nonbinding indicator of the company's general practices regarding last chance agreements. While dissenting Member Brame is correct that DC is not bound to treat the new grievance in the same way it treated previous last chance grievances, information about the past may nevertheless provide the Union with a helpful barometer as it decides whether to pursue a grievance founded on a last chance agreement. The information was therefore relevant under the liberal standard of relevance that governs DC's obligation to provide requested information.

■■■■ DC also violated the act by threatening Mr. Valentin with discipline and discharge if he continued to make information requests. Section 8(a)(1) of the NLRA prohibits "coercive statements that threaten retaliation against employees for the exercise of their rights to organize and to participate in union activities." *Tasty Baking,* 254 F.3d at 124 (characterizing 29 U.S.C. § 158(a)(1)). An employer's action violates the Act if, "considering the totality of the circumstances, the statement has a reasonable tendency to coerce or to interfere with those rights." *Id.* While an employer may discipline employees to maintain order, *see J.P. Stevens & Co.,* 219 N.L.R.B. 850 (1975), *enf'd,* 547 F.2d 792 (4th Cir.1976), it may not threaten or discipline a union official when it dislikes the way he carries out his union job, *see* NLRA § 8(a)(1), 29 U.S.C. § 158(a)(1); *ILGWU v. Quality Mfg. Co.,* 420 U.S. 276, 280-81, 95 S.Ct. 972, 974–75, 43 L.Ed.2d 189 (1975).

The Board correctly found that the memorandum to Mr. Valentin threatening discharge was overly broad, because it could be read to threaten discipline for any future request for information. This blanket threat was unwarranted and interfered with Mr. Valentin's ability to perform his representational duties. As such, it violated the Act.

## C. *The Board's* Collyer *Doctrine*

■■■■ In the proceedings before the Board, DC maintained that the allegations concerning its refusal to furnish information should have been deferred under the *Collyer* doctrine to the grievance and arbitration procedure set forth in the parties' CBA. As noted above, however, the Board has long adhered to a policy of refusing to defer disputes concerning information requests. *See, e.g., General Dynamics Corp.,* 270 N.L.R.B. 829 (1984). It is also clear that the Board is not required by the NLRA or by "national labor policy" to defer information request cases to arbitration. *Acme,* 385 U.S. at 438-39, 87 S.Ct. at 569. Indeed, in *Acme,* the Supreme Court observed that when the Board acts to ensure the flow of relevant information, it does so "in aid of the arbitral process." *Id.* at 438, 87 S.Ct. at 569. The Court noted that "[a]rbitration can function properly only if the grievance procedures leading to it can sift out unmeritorious claims," and that it would be inefficient to require "the union to take a grievance all the way through to arbitration without providing the opportunity to evaluate the merits of the claim." *Id.*

■■■■ This court is obliged to uphold the Board's policy on the scope of *Collyer* so long as it is "rational and consistent with the Act," and so long as the Board's reasoning is not "inadequate, irrational, or arbitrary." *Allentown Mack Sales & Serv., Inc. v. NLRB,* 522 U.S. 359, 364, 118

S.Ct. 818, 822, 139 L.Ed.2d 797 (1998) (internal quotations omitted); *accord NLRB v. Am. Nat'l Can Co.*, 924 F.2d 518, 522 (4th Cir.1991) ("The Board's decision concerning deferral to arbitration is to be affirmed unless found to be an abuse of discretion."). The Board "acts unreasonably if it departs from established policy without giving a reasoned explanation for the change." *Chelsea Indus., Inc. v. NLRB*, 285 F.3d 1073, 1075–76 (D.C.Cir. 2002) (citing *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1443-44 (D.C.Cir.1997)). As we have already indicated, the Board's decision in this case is perfectly consistent with, not a change from, well established precedent. Therefore, the Board had no obligation to offer a reasoned explanation for any *change*. There was no change of Board policy in this case and DC does not suggest any.

 DC's primary argument is that, in refusing to defer the § 8(a)(5) allegations, the Board contravened its decision in *United Aircraft Corp.*, 204 N.L.R.B. 879 (1972), *aff'd sub nom. Int'l Ass'n of Machinists v. NLRB*, 525 F.2d 237 (2d Cir. 1975). In *United Aircraft*, the Board held that the interpretation of the parties' CBA, particularly its provision on the duty to furnish information at the second stage of the grievance procedure, was best left to an arbitrator. *Id.* at 880. DC argues that *United Aircraft* governs, because the parties' CBA states that, at Step Two of the grievance procedure, each party will "endeavor in good faith" to furnish all information available with respect to the grievance. *See* Agreements Between Chrysler Corporation and the UAW § 21(b) (Oct. 14, 1996), *reprinted in* J.A. 132-33.

DC's argument is unpersuasive. *United Aircraft* is an almost 30-year-old case that does not reflect the Board's current policy on the application of *Collyer* to information-request cases. And *United Aircraft* is the *only* case cited by DC in support of its position. At oral argument before this court, DC's counsel acknowledged that the Board's policy since *United Aircraft* has been entirely consistent in holding that information cases will not be deferred under *Collyer*. He also acknowledged that DC was seeking to overturn this well-established policy and not that the Board's decision in this case reflects a change in policy. Indeed, counsel acknowledged that all of the Board's case law since *United Aircraft* supports the Board's decision in this case.

At most, *United Aircraft* stands for the unsurprising principle that "the union's right to disclosure of relevant and necessary data can be waived by the union in a collective bargaining agreement." 1 The Developing Labor Law, *supra*, at 859. And after the Court's decision in *Metropolitan Edison*, such a waiver must be "clear and unmistakable." 460 U.S. at 708, 103 S.Ct. at 1477. Otherwise

> *United Aircraft* may have been overruled sub silentio. In *International Harvester Co.*, [241 N.L.R.B. 600 (1979)] without citing *United Aircraft*, the Board held that a provision in a collective bargaining agreement that vested the arbitrator of a grievance with authority to order disclosure of information did not require deferral of unfair labor practice charges alleging wrongful refusal to turn over information that would assist the union in determining whether to initiate the grievance process. In later decisions, the Board has refused to defer to arbitration in cases where the information sought relates directly to the subject matter of other pending grievances. Even where an employer claimed that the underlying subject matter was arbitrable, the Board refused to defer to arbitration.

1 THE DEVELOPING LABOR LAW, *supra*, at 888 (footnotes omitted).

The Board's current practice appears to emanate from two cases decided in the mid-1980's. In the first, *General Dynamics Corp.*, the Board adopted the conclusions of the ALJ, who had found that the union had a statutory right to receive the requested information. 270 N.L.R.B. at 829-30, 1984 WL 36451. The ALJ found that the union had not "clearly and unmistakably" waived that right in the CBA, despite the presence of a clause providing for factual investigation at Step Two of the CBA's grievance procedure. *Id.* at 834-35 (citing *Metropolitan Edison*, 460 U.S. at 708 & n. 12, 103 S.Ct. at 1477 & n. 12). The Board held that it would not defer the disputes over requests for information to arbitration. The Board cited its earlier decision, also called *General Dynamics Corp.*, in explaining its *Collyer* policy of refusing to defer information cases to the grievance and arbitration process:

> [T]he procedural issue of disclosure of the [information] is merely preliminary to the resolution of the parties' substantive dispute over the [issues raised by the grievances]. In these circumstances, we find no merit in encumbering the process of resolving the pending . . . grievances with the inevitable delays attendant to the filing, processing, and submission to arbitration of a new grievance regarding the information request. Such a two-tiered arbitration process would not be consistent with our national policy favoring the voluntary and expeditious resolution of disputes through arbitration.

*Id.* at 829 (citing 268 N.L.R.B. at 1432 n. 2) (brackets and ellipses in original).

The Board reaffirmed the policy of *General Dynamics* in *United Technologies*. In that case, the Board refused to defer any of the unfair labor practices concerning requests for information, notwithstanding the presence of an information provision in "Step Two" of the parties' CBA. 274 N.L.R.B. at 505 (citing *General Dynamics*). The Board also found that the union had clearly and unmistakably waived its statutory right to receive certain information in connection with the preparation of a future grievance. *Id.* at 507. However, the "clear and unmistakable" waiver was not based on the "Step Two" grievance provision alone. Instead, the Board's decision rested on the conjunction of the CBA's Step Two information provision *and* a separate letter of understanding between the union and the company in which the union explicitly relinquished its right to certain requests for information. *Id.* *United Technologies* thus demonstrates that a Step Two information provision in the CBA, on its own, is not enough to constitute a clear and unmistakable waiver of the statutory right to receive information. The result in *United Technologies* was not surprising, because the Board has long held that "the mere existence of a grievance machinery does not relieve a company of its obligation to furnish a union with information needed to perform its statutory functions." *Timken Roller Bearing Co.*, 138 N.L.R.B. 15, 16 (1962), enf'd, 325 F.2d 746 (6th Cir.1963).

The Board's policy of excluding information-request cases from *Collyer*'s reach has remained consistent since *General Dynamics* and *United Technologies*. *See Clarkson Indus.*, 312 N.L.R.B. at 355 (holding that the Board "has not deferred cases involving requests for information") (citing *United States Postal Serv.*, 276 N.L.R.B. 1282, 1285 (1985)); *United States Postal Serv.*, 307 N.L.R.B. 1105, 1108 (1992) (stating that it is "the Board's general policy not to defer information requests to the parties' arbitration process") (citing *Clinchfield Coal Co.*, 275 N.L.R.B.

1384 (1985)), *enf'd,* 17 F.3d 1433 (4th Cir. 1994). The crystal-clear nature of the Board's *Collyer* doctrine was most recently highlighted by its opinion in *Ormet Aluminum Mill Products Corp.,* 335 N.L.R.B. No. 65, 2001 WL 1203207 (Aug. 27, 2001), in which the Board adopted the ALJ's finding that the company had violated NLRA § 8(a)(5) by refusing to furnish certain requested information to the union. Chairman Hurtgen dissented, arguing that it would be more prudent to have an arbitrator decide both the contractual question at issue in the underlying grievance and the "informational" issue. *Id.* at 4. Chairman Hurtgen argued that it is "not sensible to have one forum (the Board) decide information issues and another forum (the arbitrator) decide the merits." *Id.* He "recognize[d] that the Board refuses to 'Collyerize' information cases," but he advocated abandoning that policy and adopting his recommended approach, which, he urged, would "prevent the waste of the Board's time and resources." *Id.* (footnote omitted).

The majority rejected Chairman Hurtgen's approach, in part because it found that his approach ignored "the benefit to the grievance procedure derived from a party's prompt fulfillment of its obligation to furnish requested information." *Id.* at 3. The majority cited the Supreme Court's reasoning in *Acme,* in which the Court disapproved of forcing a union to "take a grievance all the way through to arbitration without providing the opportunity to evaluate the merits of the claim." *Id.* (citing *Acme,* 385 U.S. at 438, 87 S.Ct. at 569). In short, the majority found that the arbitration process could only function effectively if the Board continued to enforce directly the duty to furnish relevant information.

We do not purport to take sides in this colloquy between Board members. The Board always will be free in the future to consider expanding *Collyer* to include deferment of information cases, either on a theory of "exhaustion," *see Hammontree,* 925 F.2d at 1496-99, or because the parties agreed to arbitrate the claim, *see id.* at 1503 (Edwards, J., concurring) (stating that even without a "clear and unmistakable" waiver, the Board *could* still require deferment where parties agree to arbitrate a statutory claim). Such a change, however, is squarely within the purview of the Board, not of this court. That few cases challenging this aspect of the Board's *Collyer* policy have been brought before the Courts of Appeals in the past two decades suggests that the Board's latitude in this regard is obvious. *Cf. Am. Nat'l Can Co.,* 924 F.2d at 522 (upholding a refusal to defer requests for information and recognizing that "the Board has traditionally refused to defer in right-to-information cases"); *NLRB v. Safeway Stores, Inc.,* 622 F.2d 425, 428-29 (9th Cir.1980) (holding that the Board did not abuse its discretion by refusing to defer an information dispute to arbitration).

One final word is in order. The Board's refusal to depart from its *Collyer* policy simply because of the presence of a Step Two information provision in the CBA grievance procedure is perfectly consistent with established Board policy. First, the mere reference to "information" in a single step of a grievance procedure falls short of the Board's current requirement of a "clear and unmistakable" waiver. Indeed, DC did not mount a serious argument that the parties' CBA in this case contained a clear and unmistakable waiver of the Union's right to receive information at any stage of the grievance procedure, or even outside the context of a formal grievance. Nor could it have. The grievance procedure's clause on information at Step Two is not, on its own, the kind of express relinquishment of statutory rights that the

Board requires. *See General Dynamics,* 268 N.L.R.B. at 1432 n. 2 (holding that the Step Two language "does not constitute a 'clear and unmistakable' waiver" and refusing to defer the dispute over the union's request for information).

Second, when one considers that not all requests for information arise in the context of a formal grievance, let alone at "Step Two," it would make no sense to rely on such a provision to overcome the Board's current policy under *Collyer.* In this case, for example, the request for "last chance" information was made *after* the employee's grievance had already been denied at Step Two. Order at 1. As discussed *supra,* the Union made the request in order to evaluate whether it was worth proceeding to arbitration on the underlying grievance. In other cases, a union might make a stand-alone request for information in order to determine whether to initiate a grievance at all. It is therefore unsurprising that, in *United Technologies* and in this case, the Board refused to defer the issues notwithstanding the presence of a Step Two information provision.

### III. CONCLUSION

For the foregoing reasons, we deny the petition for review and grant the Board's cross-application for enforcement.