# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued November 19, 2015          Decided March 22, 2016

No. 14–1197

DOVER ENERGY, INC., BLACKMER DIVISION,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 14–1221

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Keith E. Eastland* argued the cause for the petitioner. *William H. Fallon* was with him on brief.

*Marni L. von Wilpert*, Attorney, National Labor Relations Board, argued the cause for the respondent. *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Kira Dellinger*, Supervisory Attorney were with her on brief.

Before: HENDERSON, PILLARD and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* HENDERSON.

KAREN LECRAFT HENDERSON, *Circuit Judge*: In a two-to-one decision, the National Labor Relations Board (Board) held that Dover Energy, Inc., Blackmer Division (Blackmer) committed an unfair labor practice when it warned one of its employees, Tom Kaanta, to stop submitting "frivolous" information requests that his union, the United Auto Workers Union, Local 828 (Union), had not authorized. Because the record—viewed with the deference due the Board—lacks substantial evidence in support of the Board's decision, we grant Blackmer's petition and deny the Board's cross-application for enforcement.

## I.

Blackmer is a Michigan industrial-pump manufacturer. For decades, Blackmer had a collective bargaining agreement (CBA) with the Union. To monitor adherence to the CBA on a day-to-day basis, the Union elected certain Blackmer employees to serve as stewards, who acted as liaisons between the Union and Blackmer and were responsible for investigating and settling employee grievances.

During the summer of 2012, Blackmer and the Union began to negotiate a new contract to replace the then-current CBA, which was set to expire in September 2012. John Kaminski (Kaminski), Blackmer's Director of Human Resources, served as the company's lead negotiator. A bargaining committee consisting of Union president Dennis Raymond (Raymond) and several other Union representatives conducted negotiations on behalf of the Union.

Enter Tom Kaanta. Kaanta, a long-time Blackmer employee with past service as a Union steward, was elected in June 2012 to serve again as a steward, representing skilled-services employees on the second shift—a group of four employees. Notably, Kaanta was not a member of the Union bargaining committee and did not participate in any CBA negotiations.

As CBA negotiations progressed, Kaanta apparently grew suspicious that members of the Union bargaining committee had conflicts of interest that could compromise their ability to effectively represent Union members at the negotiating table. Thus, on June 12, 2012, Kaanta submitted a handwritten "Information Request" to Kaminski. The request read:

> I[,] Tom Kaanta, steward of Local 828 request any and all financial information (names, dates, amounts, etc.) pertaining to any and all financial relationships outside the collective bargaining agreement (employee/subcontractors, employee liasions to subcontractors, employee/company investigators, monies, benefits, gifts, side deals, etc.) between Blackmer PSG (Dover) and Local 828 members, reps, pensioners, spouses, and immediate children. I request this information for the purpose of future bargaining.

Deferred Appendix (D.A.) 91 (errors in original).

After receiving the request, Kaminski contacted Raymond to determine if the Union had authorized Kaanta's inquiry. Raymond told Kaminski that the Union had not authorized the request and that the request was not within the scope of Kaanta's role as Union steward. On June 19, 2012, Kaminski sent Kaanta a letter denying his request. The letter

stated that "[a]ny requests must be processed through the normal bargaining committee process . . . . You are not part of the negotiation committee and your request is outside your scope." D.A. 92. After his response, Kaminski had no further contact with Kaanta about the matter.

On August 10, 2012, however, Kaanta submitted a second written "Information Request" to Kaminski. This request stated:

> Union officer requests photocopy of all employee paychecks for the payperiod ending Dec. 1 2007 and payperiod ending Aug. 5 2012. Also I request a spreadsheet printout representing all employee total hours and pay for each payperiod, starting with Aug. 12 2012, and every payperiod thereafter, until the contract is ratified.
>
> I believe the company is manipulating wage rates for the purpose of influencing the union vote! I request this information for labor board investigation.

D.A. 93 (errors in original). As he later confirmed in his testimony before an Administrative Law Judge (ALJ), Kaanta submitted this request because he believed Blackmer was offering various wage increases to employees in order to shore up employee support for the new CBA once it was finalized and before the Union membership voted on it.

Kaminski again contacted Raymond, as well as the chair of the Union bargaining committee, to determine if the Union had authorized Kaanta's request. The Union officials again told Kaminski that the Union had not authorized the request and that he should not honor it.

5

On August 23, 2012, Kaminski responded to Kaanta's second request by issuing a "verbal" warning, albeit in written form.[1]  *See* D.A. 94.  Kaminski and three other members of Blackmer management met with Kaanta to deliver the warning and to explain that Blackmer did not intend to bargain with him individually.  *See* D.A. 188, ALJ Hr'g Tr. 86:15–20 (Kaminski: "I basically stated to him that he was again outside of his scope, that anything relating to the collective bargaining process had to go through the bargaining committee, that I would not individually bargain with him . . . or supply any information that would be considered individually bargaining for him . . . .").

The warning stated *in toto*:

> This is to serve as a verbal warning for continued frivolous requests for information (photo copies of all employee paychecks for a period ending December 1, 2007 and pay period August 5, 2012, and spreadsheets for total hours and pay for each pay period starting with August 12, 2012, and every pay period thereafter, until the contract is ratified) and interfering with the operation of the business. You are not on the Bargaining Committee and fail to work within the parameters of such to

---

[1]  The Blackmer Code of Employee Conduct does not include a "verbal" warning as recognized official discipline.  Rather, official discipline begins with a "[w]arning in writing."  *See* D.A. 161.  Kaminski issued a verbal warning because he thought Kaanta's conduct did "not necessarily [warrant] a written warning" and hoped that "a verbal warning[] would stop the activity."  D.A. 188, ALJ Hr'g Tr. 89:1–3.  Kaminski put the verbal warning in writing so there would be no question that Kaanta understood that his requests had to stop.

> bring matters to the Bargaining Committee. We are not individually bargaining with you or any other individual.
>
> Similar requests such as this will result in further discipline up to and including discharge.

D.A. 94.

On December 11, 2012, Kaanta filed an unfair labor practice charge with the Board's Office of the General Counsel (OGC). He amended the charge on September 11, 2013,[2] and the OGC issued a complaint on September 13, 2013, alleging that Blackmer's "verbal" warning violated sections 8(a)(1) and 8(a)(3) of the National Labor Relations Act (NLRA or Act) by interfering with Kaanta's right to engage in protected concerted activity.

Subsequently, the ALJ conducted a hearing, at which Kaanta, Kaminski and Raymond testified. The ALJ concluded that Blackmer had not committed an unfair labor practice in issuing the verbal warning. Specifically, the ALJ found that Kaanta's requests did not constitute "union activity or other protected concerted activity": instead, they "burdened

---

[2] The nine-month delay resulted from the OGC Regional Director's decision to defer the case to the Union's internal grievance procedure. Kaanta appealed that decision to the Board General Counsel but the General Counsel upheld the deferral. In late February 2013, Kaanta filed a grievance with Blackmer, which Blackmer denied on March 5, 2013. The Union membership then voted on whether to refer the grievance to arbitration; the membership voted not to do so, thereby ending the internal grievance process. Thus, it was not until September 2013—after the internal grievance process had run its course—that Kaanta filed his amended charge.

respondent, potentially intruded upon the privacy of bargaining unit members, and potentially interfered with negotiations between management and the Union for a new collective-bargaining agreement." *Dover Energy, Inc., Blackmer Div.*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at \*6, \*9 (Sept. 17, 2014).

The OGC filed exceptions to the ALJ's rulings, focusing on the ALJ's "failure to make findings of facts and conclusions of law as to whether [Blackmer] independently violated . . . the Act by threatening . . . Kaanta with discipline, up to and including discharge, if he makes 'frivolous' information requests in the future." Gen. Counsel's Exceptions to ALJ's Bench Decision ¶ 1, D.A. 11. The OGC contended that, even if Blackmer's warning responding to Kaanta's two requests did not violate the NLRA, its threat of discipline for similar requests in the future constituted an independent violation. *See id*. ¶¶ 1–3, D.A. 11.

The Board majority agreed with the OGC. *See Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at \*1, \*3 n.4. It held that Blackmer had violated section 8(a)(1) of the NLRA by threatening Kaanta with discipline for future activity. *See id.* at \*3. Member Miscimarra dissented. *See id.* at \*4 (Member Miscimarra, dissenting). Although he agreed that the case turned on whether Kaanta "would have reasonably understood that [the verbal warning] threatened discipline for *future* information requests that were within the scope of his duties," he believed "a reasonable employee in Kaanta's situation would have understood perfectly well that the warning did not threaten future discipline over legitimate information requests," concluding that "the record is devoid of evidence that [Blackmer] has ever warned Kaanta that requesting information to investigate a potential grievance could result in discipline or discharge." *Id.* (emphasis in

original). Blackmer timely petitioned for review and the Board cross-applied for enforcement of its order.

## II.

We "will not disturb an order of the NLRB unless, reviewing the record as a whole, it appears that the Board's factual findings are not supported by substantial evidence or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue." *Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 651 (D.C. Cir. 1994). And we will uphold a Board decision supported by substantial evidence "even if we would have reached a different result had we considered the question *de novo*." *Id.* That said, "our review 'must take into account whatever in the record fairly detracts from the weight' of the evidence cited by the Board to support its conclusions," *id.* (alteration omitted) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)), and we do not "merely rubber-stamp NLRB decisions," *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) (quoting *Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1062 (D.C. Cir. 2001)). As we have said repeatedly, "this court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy . . . ." *Id.* (quoting *Peoples Gas Sys., Inc. v. NLRB*, 629 F.2d 35, 42 (D.C. Cir. 1980)).

The general principles governing this case are well-settled. "Section 8(a)(1) of the NLRA prohibits an employer's interference with, or restraint or coercion of, the rights of employees to organize and join unions, bargain collectively, and engage in certain other 'concerted activities.' " *Flagstaff Med. Ctr., Inc. v. NLRB*, 715 F.3d 928,

930 (D.C. Cir. 2013) (quoting 29 U.S.C. §§ 157, 158(a)(1)). The test for interference, restraint and coercion under section 8(a)(1) is an objective one; an employer violates section 8(a)(1) "if, considering the *totality of the circumstances*, [the employer's conduct] has a *reasonable tendency* to coerce or interfere with [employee] rights." *Id.* at 930–31 (emphases added) (quoting *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001)); *accord DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 444 (D.C. Cir. 2002).

Accordingly, "coercive statements that threaten retaliation against employees" for lawfully exercising their rights violate the Act. *Tasty Baking*, 254 F.3d at 124. The same is true if an employer threatens discipline for engaging in protected activity in the future. *See DaimlerChrysler*, 288 F.3d at 444 (memo to employee that could be read as threatening "discipline for *any* future request for information" violates Act (emphasis added)); *Parexel Int'l, LLC*, 356 N.L.R.B. No. 82, 2011 WL 288784, at *5 (Jan. 28, 2011) ("[T]he Board has often held that an employer violates the Act when it acts to prevent future protected activity."). Thus, if an employer makes a statement that an employee *reasonably understands* to threaten discipline for future protected activity, the employer violates the Act. *See DaimlerChrysler*, 288 F.3d at 444; *see also Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972, 975 (D.C. Cir. 1998) ("The employer's motive and the actual effect of its statements are irrelevant. Instead, the test is whether the employer's statements may reasonably be said to have tended to interfere with employees' exercise of their Section 7 rights." (citation and quotation marks omitted)).

Here, the Board accurately framed the issue in accordance with these well-settled principles: "The question of whether [Blackmer's] warning to Kaanta violated Section

8(a)(1) . . . turns on whether the warning would reasonably be understood to proscribe future protected activity." *Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *2. The Board answered this question in the affirmative, concluding that Kaanta "would reasonably conclude . . . that [future information requests], though protected, could trigger the warning's threat of discipline or discharge." *Id.* at *3. Its rationale proceeded as follows: (1) the warning referred to Kaanta's August 10th request for employee wage-and-hour information; (2) it cautioned that "[s]imilar requests such as this" would result in discipline or discharge; (3) Kaanta *qua* Union steward was authorized to make employee wage-and-hour information requests, which requests constitute protected activity; *ergo* (4) Kaanta "would reasonably conclude" that the "[s]imilar requests" triggering discipline or discharge included protected wage-and-hour information requests he might later submit in his role as Union steward. *See id.* at *3.

The Board's conclusion is not supported by substantial evidence in the record. Although required to consider the "totality of the circumstances," *see Flagstaff Med. Ctr.*, 715 F.3d at 930, the Board failed to do so. As the Board dissent makes clear, "no employee in Kaanta's position would have reasonably believed that he or she risked discipline by submitting *legitimate* future information requests for wage and hour information." *See Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *4 (Member Miscimarra, dissenting) (emphasis added).

That the record belies the Board's reading of the verbal warning is plain from the warning's language and the circumstances surrounding its issuance, neither of which the Board adequately considered. The Board gave a selective reading to the warning's language. Indeed, it considered only two portions: the parenthetical reference to Kaanta's August

10th request for employee wage-and-hour information and the statement that "[s]imilar requests such as this will result in further discipline up to and including discharge." *See id.* at *3. Interpreting the two statements in light of the undisputed fact that Kaanta was authorized—and likely—to request employee wage-and-hour information in the future as Union steward, the Board concluded that a reasonable employee in Kaanta's position would read the redundant phrase "[s]imilar requests such as this" to mean *all* requests for wage-and-hour information, including *authorized* requests. *Id.* According to the Board, Blackmer's warning was that type of "overly broad . . . blanket threat," *DaimlerChrysler*, 288 F.3d at 444, the Act prohibits. *See Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *3.

Even with all deference due the Board, we cannot find substantial support for its decision in the evidence. First, the warning targeted specific, *unprotected* conduct. The language the Board did not discuss makes this plain. It was issued "for *continued frivolous* requests for information." D.A. 94 (emphasis added). A reasonable person in Kaanta's position would understand from this language that he was not to "continue[]" making requests like the two he had just made— a reference that could only include his June 12th and August 10th requests because he had *never* submitted any other information requests, despite his off-and-on service in various Union roles—including steward—for nearly twenty years. The meaning of "frivolous" is equally plain as shorthand for "not authorized by the Union." Indeed, responding to Kaanta's June 12th request, Blackmer rejected it as "outside [Kaanta's] scope." D.A. 92.

The Board makes hay of the warning's parenthetical reference to the wage-and-hour information Kaanta requested on August 10th, *see* D.A. 94 ("photo copies of all employee

paychecks for a period ending December 1, 2007 and pay period August 5, 2012, and spreadsheets for total hours and pay for each pay period starting with August 12, 2012, and every pay period thereafter, until the contract is ratified"), concluding that Kaanta would understand it to potentially proscribe an *authorized* request for similar information in the future. *See Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *3. But read in proper context, the reference is to the precise—and frivolous—*request* Kaanta made. Indeed, the parenthetical recites—almost verbatim—Kaanta's August 10th request. In other words, the warning does not address requests for a particular type of *information*; it addresses a particular type of *request*—namely, continued requests outside the scope of Kaanta's role as Union steward.[3]

The warning also again reminded Kaanta that he was "not on the [Union] Bargaining Committee," that he had "fail[ed] to work within the parameters of such to bring matters to the

---

[3] Perhaps the Board's focus on the type of information requested, rather than on the request itself, is what ultimately led it astray. The Board noted that "the August 23 warning referred to Kaanta's August 10 request for information about unit employees' hours and pay and specifically informed Kaanta that '[s]imilar requests such as this will result in further discipline up to and including discharge.' " *Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *3. It then noted that "future requests for *such information* could well be protected" and that Kaanta could thus reasonably read the warning to prohibit future protected activity. *Id.* (emphasis added). No one disputes the Board's conclusion that future requests for employee wage-and-hour information "could well be protected," *id.*, but this conclusion is beside the point. The warning targeted the type of *request*—"continued[,] frivolous" ones—not the type of *information*. D.A. 94. The Board's analysis might have been sound had the warning said—as the Board apparently read it—"future requests for *such information* will result in further discipline up to and including discharge." But it does not.

Bargaining Committee" and that Blackmer was "not individually bargaining with [him] or any other individual." D.A. 94. This language immediately precedes "[s]imilar requests," *see id.*, and repeats the point Blackmer made to Kaanta after he submitted his June 12th request (which request had nothing to do with wage-and-hour information); that is, Blackmer told him then, "You are not part of the negotiation committee and your request is outside your scope." D.A. 92; *see also Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *4 (Member Miscimarra, dissenting). This language makes the admonition against "[s]imilar requests *such as this*" unambiguous: the earlier requests were problematic because they were outside the scope of Kaanta's responsibilities as a steward. *See* D.A. 94 (emphasis added). The outside-the-scope conclusion was not one Blackmer reached on its own—Blackmer *twice* contacted the Union to determine if it had authorized the requests and both times the Union stated it had not done so and suggested the requests be denied.

Moreover, fear of Blackmer's invoking the warning's disciplinary threat willy-nilly is particularly unreasonable here. Nothing in the record suggests Blackmer prevented Kaanta or anyone else from making legitimate information requests; indeed, Blackmer did not take any disciplinary action after Kaanta's first frivolous request and it gave Kaanta, in effect, a second warning as opposed to actual discipline. *See supra* note 1. In sum, the company did not act in a reckless or retaliatory fashion towards Kaanta. This is a relevant consideration. *See Aroostook Cnty. Reg'l Ophthalmology Ctr. v. NLRB*, 81 F.3d 209, 213–14 (D.C. Cir. 1996) (company's enforcement history relevant consideration in whether rule interfered with employee rights); *Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *4 (Member Miscimarra, dissenting) ("[T]he record is devoid of

evidence that [Blackmer] has ever warned Kaanta that requesting information to investigate a potential grievance could result in discipline or discharge.").

When viewed in its entirety, as we must view it, the record supports only one reasonable interpretation of the verbal warning: Kaanta would be disciplined if in the future he *continued* to do what he had done twice before—namely, make an *unauthorized* information request unrelated to his duties as Union steward. In our view, the dissent (and, earlier, the ALJ) got it right: under the objective test used to determine a section 8(a)(1) violation *vel non*, no reasonable employee in Kaanta's position would have understood the warning to threaten discipline for engaging in future protected activity. *See Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *4.

Contrary to the Board's suggestion, our *DaimlerChrysler* decision is not at odds with this result. *See* 288 F.3d at 444. There, we found that an employer violated the Act because its warning "could be read to threaten discipline for any future request for information," including a protected request. *Id. And* we found that the request to which the warning responded itself constituted protected activity. *See id.* at 443–44. Not so here. As discussed, the warning did not threaten discipline for "*any*" future request for information, *id.* at 444 (emphasis added), only "[s]imilar" ones, D.A. 94. The other cases the Board relies upon, *see Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *2–3 & n.4, are likewise distinguishable: all involved a threat made in response to *protected* activity, *see, e.g.*, *Ellison Media Co.*, 344 N.L.R.B. 1112, 1113–14 (2005) (threat unlawful because it could be construed to apply to "protected" conduct of employees' discussion of their supervisor's conduct); *ITT Fed. Servs. Corp.*, 335 N.L.R.B. 998, 1003 (2001) (threat in response to

"the protected activity of posting union signs"); *Yale Univ.*, 330 N.L.R.B. 246, 248–50 (1999) (unlawful threat made in response to and directed toward "protected conduct"). In all of these cases, protected conduct had occurred, to which conduct the employee would reasonably connect the threat of future discipline; he could have reasonably understood that he was inviting discipline if he engaged in similar conduct in the future notwithstanding that conduct was protected. Here, neither the ALJ nor the Board found that Kaanta's June 12th and August 10th requests were protected. On the contrary, the ALJ expressly found that they were *not* protected, *see Dover Energy*, 361 N.L.R.B. No. 48, 2014 WL 4659319, at *9–10, and the Board expressly declined to conclude otherwise, *id.* at *3 n.4 ("We find it unnecessary to decide whether Kaanta's June 12 and August 10 information requests, which occasioned the warning, were themselves protected activity . . . ."). Reading the warning to cover future *protected* activity requires an inferential leap the record does not support and the precedent the Board offers in support of its conclusion falls well short of the mark.

In this case, an employer gave a specific person a specific warning after he engaged in specific inappropriate conduct. There is no substantial evidence to support the Board's conclusion that a reasonable person would view the warning as applying more broadly to appropriate, legally protected conduct carried out in entirely different circumstances. We recognize that an employer's genuine "blanket" threat to discipline for future *protected* activity would violate the Act, even if, as here, the warning responded to *unprotected* activity. *See DaimlerChrysler*, 288 F.3d at 444. But that is not this case. Here, the warning made plain it sought one thing—to stop Kaanta's "continued," "frivolous" information requests that the Board does not dispute were outside the scope of his steward duties and that his Union had expressly

disapproved. *See* D.A. 94. No reasonable employee in Kaanta's position could read it otherwise.

For the foregoing reasons, we grant the petition for review and deny the cross-application for enforcement.

*So ordered.*