Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S. App. D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

--------

Argued May 9, 2005            Decided July 5, 2005

No. 04-1278

BREWERS AND MALTSTERS, LOCAL UNION NO. 6, AFFILIATED WITH THE INTERNATIONAL BROTHERHOOD OF TEAMSTERS, PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD, RESPONDENT

ANHEUSER-BUSCH, INC., INTERVENOR

--------

Consolidated with
Nos. 04-1297 & 04-1316

--------

On Petitions for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

--------

*Arthur G. Telegen* argued the cause for petitioner Anheuser-

Busch, Inc.  With him on the briefs was *Robert A. Fisher*.  *John H. Henn* entered an appearance.

*Arthur J. Martin* argued the cause for petitioner Brewers and Maltsters, Local Union No. 6.  With him on the briefs was *Stacey A. Aschemann*.

*Philip A. Hostak*, Attorney, National Labor Relations Board, argued the cause for respondent.  With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Robert J. Englehart*, Supervisory Attorney.

*Arthur G. Telegen* and *Robert A. Fisher* were on the brief for intervenor Anheuser-Busch, Inc.

*Arthur J. Martin* and *Stacey A. Aschemann* were on the brief for intervenor Brewers and Maltsters, Local Union No. 6.

Before: GINSBURG, *Chief Judge*, and SENTELLE and ROGERS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Opinion dissenting in part filed by *Circuit Judge* SENTELLE.

ROGERS, *Circuit Judge*:  Anheuser-Busch, Inc. installed hidden surveillance cameras to monitor an area where its employees occasionally work and take breaks.  As a result of misconduct that Anheuser-Busch discovered on footage from the cameras, five employees were discharged and lesser discipline was imposed on eleven others.  The National Labor Relations Board, with one member dissenting, ruled that Anheuser-Busch violated section 8(a)(5) and (1) of the National

Labor Relations Act, as amended ("the Act"), 29 U.S.C. § 158(a)(5), (1) (2000), by failing to bargain with Brewers and Maltsters, Local Union No. 6 over the installation and use of the hidden surveillance cameras and by failing to provide the Union with information it requested about the use of such cameras. *Anheuser-Busch, Inc.*, 342 N.L.R.B. No. 49 (July 22, 2004). The Board, with a different member dissenting, refused to order Anheuser-Busch to rescind the discipline and to make the disciplined employees whole. *Id.* Anheuser-Busch petitions for review of the Board's determination that it violated the Act, the Union petitions for review of the Board's remedy, and the Board cross-applies for enforcement of its Order. We deny Anheuser-Busch's petition, grant the Union's petition, and remand the case to the Board to determine the appropriate remedy.

**I.**

In response to concern that an elevator motors room on the roof of one of its buildings was being used for activities inconsistent with its employees' work assignments and possibly for drug use, Anheuser-Busch installed two hidden surveillance cameras to monitor that room and the rooftop stairs leading to it. The elevator motors room is on the eighth-floor roof of Stockhouse 16, one of Anheuser-Busch's brewing facilities in St. Louis, Missouri, and, as its name suggests, it contains the electrical motors and systems that operate the building's elevators. It is accessible using a short staircase located on the roof. Although employees do not work frequently in that room, on at least a monthly basis bargaining-unit employees enter the room to perform a lock-out and tag-out procedure that immobilizes the elevators for cleaning. There are no signs restricting access to the roof, and Anheuser-Busch never instructed its employees that they could not use the elevator motors room as a break room, although the door to that room is marked with a sign indicating that only authorized personnel are permitted inside. Anheuser-Busch is aware that employees use

the roof as a break area to escape the extreme temperatures in the Stockhouse, and the Board concluded that "the elevator motors room became an extension of the roof break area." *Anheuser-Busch, Inc.*, 342 N.L.R.B. No. 49, slip op. at 1.

During an inspection of the premises in late April or early May 1998, an Anheuser-Busch supervisor informed Assistant Brewmaster Mel Harris that he had discovered a table, four chairs, a number of mattress-sized foam pads, and pieces of cardboard in the elevator motors room. Harris notified Anheuser-Busch's Captain of Security William Dougherty, and they, along with the Manager of Human Resources, inspected the room. According to the Administrative Law Judge ("ALJ"), these articles led Dougherty to conclude that "persons were using the room for reasons inconsistent with any work assignment and possibly illegal drug activity might be ongoing." *Id.* at 7. In response, on May 17, 1998, Anheuser-Busch installed a non-oscillating hidden surveillance camera in a gang box with a pinhole; it was directed toward the stairs that led from the roof to the elevator motors room. A few weeks passed before Dougherty reviewed the video footage. Although the footage revealed that individuals were using flashlights to enter the elevator motors room at night, it was too dark to determine the individuals' identities or what they were doing. To remedy this problem, in early June 1998 Anheuser-Busch placed a special lens on that camera so that it could be used in low-light conditions, and it installed a second hidden surveillance camera inside the elevator motors room that was trained on the room's entrance. Both cameras operated continuously from the moment they were installed until Anheuser-Busch removed them on June 30, 1998.

The complete video footage revealed sixteen identifiable employees engaging in misconduct by smoking marijuana, urinating on company property, and/or being away from their

assigned work areas for extended periods. It also showed four employees not engaged in misconduct – two employees were performing the lock-out and tag-out procedure, one employee was removing a ladder, and one employee was engaging in no obvious work activity. Anheuser-Busch informed the Union of the hidden surveillance cameras on July 1, 1998 – the day after they were removed. The Union objected to not being informed prior to the use of the cameras, but Anheuser-Busch maintained, as it does in this court, that it had no obligation to notify or to bargain with the Union over their installation and use. Over the next two months, Anheuser-Busch conducted sixteen investigatory meetings at which each employee admitted engaging in misconduct. At the first such meeting, the Union again asked why it had not been notified prior to the cameras' installation. Anheuser-Busch responded that it was a matter of "corporate security" over which it had no obligation to bargain. Following the investigatory meetings, Anheuser-Busch disciplined the sixteen employees: five were discharged for violating the company's drug use policy; seven received last-chance agreements for leaving assigned work areas for extended periods, sleeping, and urinating on the roof; and four were suspended for leaving assigned work areas for extended periods.

The Union filed grievances on behalf of each employee, and, on October 5, 1998, before the initial arbitration hearing, it wrote to Anheuser-Busch requesting information relating to the installation and use of hidden surveillance cameras or other monitoring devices "[i]n order to carry out its responsibility under the Collective Bargaining Agreement and to properly investigate the grievance and prepare for the arbitration." Anheuser-Busch responded on October 22, 1998, by providing information about the installation of the two hidden surveillance cameras, but it stated that it was "still in the process of determining whether there is any additional information responsive to" the Union's request. On November 2, 1998, the

Union's counsel repeated the request, and Anheuser-Busch's counsel responded the next day by stating that the information was not relevant to the arbitration but that he was willing to discuss the matter at the upcoming hearing. The parties proceeded to arbitrate three of the employee discharges – deferring the remaining two until the resolution of this proceeding – and three arbitrators independently sustained the discharges but did not rule on the refusal-to-bargain issue. Anheuser-Busch, however, did not provide the Union with the requested information until May 25, 1999 – the first day of the unfair labor practice hearing before the ALJ.

On September 29, 1998, the Union filed an unfair labor practice charge that, as amended on November 13, 1998, alleged that Anheuser-Busch committed two violations of section 8(a)(5) and (1) of the Act: first, by unilaterally installing hidden surveillance cameras and disciplining sixteen employees as a result of information obtained from those cameras; and second, by failing to provide information about the use, installation, and extent of the cameras. On November 23, 1998, the Board's General Counsel issued a complaint alleging violations of section 8(a)(5) and (1), which was amended on May 18, 1999, to allege more specifically that Anheuser-Busch failed and refused to provide information that the Union requested orally and in writing.

After a two-day hearing, the ALJ issued his decision on October 1, 1999. Relying on *Colgate-Palmolive Co.*, 323 N.L.R.B. 515 (1997), the ALJ concluded that an employer's installation and use of hidden surveillance cameras in the workplace is a mandatory subject of bargaining. The ALJ therefore ruled that Anheuser-Busch violated the Act when it placed such cameras in what the ALJ determined to be a work and break area, but the ALJ refused to order make whole relief for the disciplined employees because "it is not consistent with

the policies of the Act or public policy generally to reward [employees] who engage in unprotected conduct." *Anheuser-Busch*, 342 N.L.R.B. No. 49, slip op. at 9. The ALJ also ruled that the company did not violate the Act by refusing to furnish information in response to the Union's oral request on or about July 2, 1998, but that it did violate the Act when it failed to furnish information in response to the Union's request by letter of October 5, 1998. Anheuser-Busch, the Union, and the General Counsel filed exceptions to the ALJ's decision.

Nearly five years later, a divided three-member panel of the Board issued its Decision and Order. *Anheuser-Busch, Inc.*, 342 N.L.R.B. No. 49 (July 22, 2004). One two-member majority (Chairman Battista and Member Walsh; Member Schaumber, dissenting) affirmed the ALJ's ruling that Anheuser-Busch violated section 8(a)(5) and (1) by failing to notify and to bargain with the Union before installing and using hidden surveillance cameras in the workplace. That majority relied on *National Steel Corp. v. NLRB*, 324 F.3d 928 (7th Cir. 2003), *enforcing* 335 N.L.R.B. 747 (2001), to reinforce that the use of such cameras is a mandatory subject of bargaining. Another two-member majority (Chairman Battista and Member Schaumber; Member Walsh, dissenting) affirmed the ALJ's decision not to revoke the discipline. Relying on *Taracorp Industries*, 273 N.L.R.B. 221 (1984), this majority ruled that section 10(c) of the Act, 29 U.S.C. § 160(c), precludes make-whole relief even when misconduct is discovered through unlawful means. It distinguished *Great Western Produce*, 299 N.L.R.B. 1004 (1990), and *Tocco, Inc.*, 323 N.L.R.B. 480 (1997) – two cases where the Board ordered the revocation of discipline that was based on misconduct – because it said those cases involved a unilateral change in a rule regulating employee conduct and the discipline came directly from the unilateral change. In contrast, that majority found "an insufficient nexus in the instant case between [Anheuser-Busch's] unlawful

installation and use of the cameras and the employees' misconduct to warrant a make-whole remedy." *Anheuser-Busch*, 342 N.L.R.B. No. 49, at slip op. 2. The Board unanimously affirmed, without discussion, the ALJ's rulings regarding Anheuser-Busch's responses to the Union's requests for information. The Board's Order directed Anheuser-Busch to cease and to desist, to bargain, upon request, respecting the installation and use of surveillance cameras and any other mandatory subject of bargaining, to respond in a timely manner to the Union's information requests respecting matters relevant to bargaining-unit employees, and to post appropriate remedial notices. Anheuser-Busch petitions for review of the Board's ruling that it violated the Act, the Union petitions for review of the Board's remedial Order, and each has intervened to oppose the other's petition. The Board seeks enforcement of its Order.

## II.

Under section 8(a)(5) of the Act, it is an unfair labor practice for an employer to refuse to bargain with the exclusive bargaining representative of its employees, 29 U.S.C. § 158(a)(5), and a violation of section 8(a)(5) constitutes a derivative violation of section 8(a)(1), *Exxon Chem. Co. v. NLRB*, 386 F.3d 1160, 1164 (D.C. Cir. 2004). The duty to bargain is mandatory with respect to the subjects listed in section 8(d) of the Act, 29 U.S.C. § 158(d), i.e., wages, hours, and terms and conditions of employment. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991). Subjects that are "plainly germane to the 'working environment'" and are "not among those 'managerial decisions, which lie at the core of entrepreneurial control'" are deemed "terms and conditions of employment" and therefore are mandatory subjects of bargaining. *Ford Motor Co. v. NLRB*, 441 U.S. 488, 498 (1979) (quoting *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 222, 223 (1964) (Stewart, J., concurring)). Thus, an employer's unilateral change in a term or condition of

employment without first bargaining to impasse violates section 8(a)(5) and (1). *See Litton*, 501 U.S. at 198; *Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 322 (D.C. Cir. 2003).

The court's review of the Board's determinations in an unfair labor practice proceeding is limited, *DaimlerChrysler Corp. v. NLRB*, 288 F.3d 434, 442 (D.C. Cir. 2002), and it may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*," *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The Board's classification of bargaining subjects as "terms or conditions of employment" is entitled to "considerable deference," *Ford Motor*, 441 U.S. at 495, and the court will uphold the Board's determination so long as it is "reasonably defensible," *id.* at 497; *see also Regal Cinemas, Inc. v. NLRB*, 317 F.3d 300, 307 (D.C. Cir. 2003). The Board's factual findings are conclusive if supported by substantial evidence in the record as a whole, 29 U.S.C. § 160(e); *Universal Camera*, 340 U.S. at 488. The court, however, will not enforce an order of the Board that is irrational or otherwise inconsistent with the Act. *See, e.g.*, *NLRB v. Fin. Inst. Employees*, 475 U.S. 192, 202 (1986); *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445-46 (D.C. Cir. 2004).

## A.

Anheuser-Busch contends that the Board erred in ruling that it violated section 8(a)(5) and (1), and it first relies on section 9(b)(3), 29 U.S.C. § 159(b)(3), to support the proposition that its use of hidden surveillance cameras is not a mandatory subject of bargaining because the Act exempts matters of internal security from bargaining. That reliance is misplaced. Section 9(b)(3) prohibits the Board from including both rank-and-file employees and guards in a single bargaining unit and from certifying a union as the representative of a guard bargaining unit if the

union also represents non-guards or is affiliated with a union that does so. This provision does not express a broad policy disfavoring bargaining over security-related matters. In fact, it has nothing to do with bargaining, and the Act does not prevent an employer from bargaining with a properly-constituted unit of security employees. *See, e.g.*, *Swanson Group, Inc.*, 312 N.L.R.B. 184 (1993); *J.W. Mays, Inc.*, 253 N.L.R.B. 717 (1980); *cf. Gen. Serv. Employees Union v. NLRB*, 230 F.3d 909, 913 (7th Cir. 2000). Instead, as the court has noted, "Congress drafted this provision 'to minimize the danger of divided loyalty that arises when a guard is called upon to the enforce the rules of his employer against a fellow union member.'" *Wackenhut Corp. v. NLRB*, 178 F.3d 543, 546 (D.C. Cir. 1999) (quoting *Drivers, Chauffeurs, Warehousemen, & Helpers v. NLRB*, 553 F.2d 1368, 1373 (D.C. Cir. 1977)). Similarly, the cases Anheuser-Busch cites do not suggest that matters of internal security cannot be mandatory subjects of bargaining.

Contrary to Anheuser-Busch's assertion, the Board's rulings in section 8(a)(1) unlawful-surveillance cases easily are reconcilable with its rulings that the use of hidden surveillance cameras constitutes a mandatory subject of bargaining. Although the Board has recognized that an employer may use overt surveillance of its employees' protected, concerted activities where necessary to further its legitimate security concerns, section 8(a)(1) prohibits the employer from using that surveillance in a manner having a tendency "to interfere with, restrain, or coerce employees in the exercise of" such activity, 29 U.S.C. § 158(a)(1). *See, e.g.*, *Nat'l Steel & Shipbuilding Co.*, 324 N.L.R.B. 499 (1997), *enforced*, 156 F.3d 1268 (D.C. Cir. 1998). At most, Anheuser-Busch's contention indicates that the Board's section 8(a)(1) unlawful surveillance cases do not address whether overt surveillance of protected, concerted activities is a mandatory subject of bargaining – a logical omission as section 8(a)(1) does not directly address bargaining.

Here, the Board also accommodated employers' legitimate security concerns, as its ruling does not prevent an employer from using hidden surveillance cameras after bargaining over the issue.

Anheuser-Busch further contends that *Colgate-Palmolive Co.*, 323 N.L.R.B. 515 (1997), where the Board first ruled that the installation and use of hidden surveillance cameras was a mandatory subject of bargaining, is inapposite because that case involved employees' privacy concerns about being videotaped in a restroom and a fitness room. However, as noted, the well-established test for determining whether a subject is a term or condition of employment is not whether it affects employees' privacy interests, but whether it is "plainly germane to the 'working environment'" and "not among those 'managerial decisions, which lie at the core of entrepreneurial control.'" *Ford Motor*, 441 U.S. at 498 (quoting *Fibreboard*, 379 U.S. at 222, 223 (Stewart, J., concurring)). As to the first criterion, after analogizing surveillance cameras to other mandatory subjects of bargaining – physical examinations, drug/alcohol testing requirements, and polygraph testing – because of their shared purpose as "investigatory tools," the Board in *Colgate-Palmolive* concluded that the use of hidden surveillance cameras "has the potential to affect the continued employment of employees whose actions are being monitored." 323 N.L.R.B. at 515. Although the Board also considered the privacy implications of the employer's particular use of hidden surveillance, that issue was secondary to whether the surveillance occurred in "the working environment." *Id.* In any event, although Anheuser-Busch placed the cameras at issue in less sensitive places than the employee restroom and fitness room, the potential for constant monitoring in "the working environment," *id.*, cannot be said to be free of privacy concerns. As to the second criterion, the Board in *Colgate-Palmolive* ruled that the installation and use of hidden surveillance cameras in

the workplace do not constitute managerial decisions that lie at the core of entrepreneurial control because "the use of surveillance cameras is not entrepreneurial in character, is not fundamental to the basic direction of the enterprise, and impinges directly on employment security." *Id.*

The Board reaffirmed its characterization of the use of hidden surveillance cameras as a mandatory subject of bargaining in *National Steel Corp.*, 335 N.L.R.B. 747 (2001), where the employer had installed a hidden surveillance camera in a manager's office to determine who was accessing it when the manager was not present. That the Board found the case "not distinguishable in any material respect" from *Colgate-Palmolive*, *id.* at 747, even though the area surveilled was an office, as opposed to a restroom and a fitness room, demonstrates that the extent of possible privacy concerns is not necessarily dispositive in determining whether an employer must bargain over the installation and use of a particular camera. The Seventh Circuit enforced the Board's order in *National Steel Corp. v. NLRB*, 324 F.3d 928, 932 (7th Cir. 2003), concluding that the Board's determination was "objectively reasonable and wholly supported." We agree that the Board's legal conclusion that the installation and use of hidden surveillance cameras in the workplace constitutes a mandatory subject of bargaining is eminently reasonable, especially in light of the cameras' effects on the employees' job security here.

Anheuser-Busch further faults the Board for not explaining what aspects of the use of hidden surveillance cameras should be bargained. In its Decision, however, the Board recognized that while an employer must bargain over a proposal for the use of hidden surveillance cameras and the general reasons for such a proposal, it need not "apprise the union of the location of the cameras or the time in which they will be in use." *Anheuser-Busch*, 342 N.L.R.B. No. 49, slip op. at 2 n.7. Anheuser-Busch

responds that, even with this caveat, the Board has created an unworkable situation because "instance-by-instance bargaining . . . is impractical and undercuts an employer's legitimate need for promptness and secrecy." Br. of Pet'r Anheuser-Busch, Inc. at 39. We do not read the Board's Decision to require instance-by-instance bargaining. Instead, the Board has left open what seems to be the far more practical option of a union and an employer bargaining over the general requirements for an employer's use of hidden surveillance cameras as part of their collective bargaining agreement, including, for example, whether the cameras may ever be used, in what general areas the cameras may be used, whether the employer would have to demonstrate some level of suspicion before using the cameras, and whether the cameras may be used to discipline employees. Addressing these and other issues as part of the collective bargaining agreement preserves the benefit of hidden surveillance, while also involving a union in the development of the terms and conditions of their members' employment.

Even if the installation and use of hidden surveillance cameras generally is a mandatory subject of bargaining, Anheuser-Busch contends that it still did not violate section 8(a)(5) and (1) under the circumstances presented here. It first maintains that the Board's determination that the cameras were trained on an employee work area and break area is not supported by substantial evidence in the record. The record, however, belies Anheuser-Busch's assertion. Although, as the Board noted, "the area surveilled was not a part of the physical plant in which employees worked frequently," *Anheuser-Busch*, 342 N.L.R.B. No. 49, at slip op. 1, it is undisputed that two employees had work assignments in the elevator motors room at least once a month. In fact, the hidden surveillance cameras, which were trained on the stairs leading to the elevator motors room and inside the room itself, recorded those employees performing their routine tasks. Furthermore, the record contains

ample evidence that the roof generally was a *de facto* break area and that the camera trained on the steps filmed a portion of the roof itself. This evidence is sufficient to support the Board's determination that the hidden surveillance cameras were located within the working environment and therefore that their installation and use was a mandatory subject of bargaining.

Anheuser-Busch next contends that the Union made no demand to bargain. However, a union is obligated to demand bargaining only "[i]f an employer gives a union advance notice of its intention to make a change to a term or condition of employment." *Regal Cinemas*, 317 F.3d at 314. The Union did not know about the hidden surveillance cameras until July 1, 1998 – the day after Anheuser-Busch removed them – and therefore it would have been futile for it to demand bargaining. *See, e.g.*, *id.*; *Teamsters Local Union No. 171 v. NLRB*, 863 F.2d 946, 954 (D.C. Cir. 1988). Anheuser-Busch also contends the Union cannot now claim a violation of the obligation to bargain because it long has been aware of the company's use of surveillance cameras and never has sought bargaining. To the extent that this is a waiver argument, it is contrary to the well-established principle that "a union's acquiescence in previous unilateral changes does not operate as a waiver of its right to bargain over such changes for all time." *Verizon N.Y. Inc. v. NLRB*, 360 F.3d 206, 209 (D.C. Cir. 2004) (quoting *Owens-Corning Fiberglas Corp.*, 282 N.L.R.B. 609, 609 (1987)) (internal quotation marks omitted); *see also Nat'l Steel*, 324 F.3d at 934. And, to the extent Anheuser-Busch is arguing that there has been no change in the status quo because it has used hidden surveillance cameras before, this argument is nothing more than a re-characterization of the waiver argument and suffers from the same flaws because the Union's purported past acquiescence does not have any present effect. In any event, the two isolated and dated usages of hidden surveillance cameras cited by Anheuser-Busch are insufficient to constitute a practice

that is incorporated implicitly into the terms and conditions of employment.

Therefore, because the Board reasonably concluded that the use of hidden surveillance cameras in the workplace is a mandatory subject of bargaining, substantial evidence in the record supports the Board's finding that Anheuser-Busch used these cameras in the workplace without bargaining over them, and the Union did not waive its right to object to the unilateral change in terms or conditions of employment, we defer to the Board's determination that Anheuser-Busch violated section 8(a)(5) and (1).

**B.**

Anheuser-Busch also challenges the Board's determination that it violated section 8(a)(5) and (1) by failing timely to respond to the Union's October 5, 1998, request for information. It is well-settled that "[t]he duty to bargain in good faith also includes the obligation to provide the union with information relevant to the collective bargaining process in certain circumstances." *ConAgra, Inc. v. NLRB*, 117 F.3d 1435, 1439 (D.C. Cir. 1997) (citing *Detroit Edison Co. v. NLRB*, 440 U.S. 301, 303 (1979)). An employer violates the Act not only by refusing to provide such relevant information but also by not providing it in a timely manner. *Providence Hosp. v. NLRB*, 93 F.3d 1012, 1021-22 (1st Cir. 1996); *Woodland Clinic*, 331 N.L.R.B. 735, 736 (2000); *Leland Stanford Junior Univ.*, 307 N.L.R.B. 75, 80 (1992). Although "[a] union's bare assertion that it needs information to process a grievance does not automatically oblige the employer to supply all the information in the manner requested," *Detroit Edison*, 440 U.S. at 314, the court has held that the "the threshold for relevance is low," *DaimlerChrysler*, 288 F.3d at 443 (quoting *Country Ford Trucks, Inc. v. NLRB*, 229 F.3d 1184, 1191 (D.C. Cir. 2000)) (internal quotation marks omitted), such that "[t]he fact that the

information is of probable or potential relevance is sufficient to give rise to an obligation . . . to provide it," *Crowley Marine Servs., Inc. v. NLRB*, 234 F.3d 1295, 1297 (D.C. Cir. 2000) (quoting *Oil, Chem. & Atomic Workers Local Union v. NLRB*, 711 F.2d 348, 359 (D.C. Cir. 1983)) (alteration and omission in original). It therefore is sufficient that the information sought is relevant to the investigation and processing of grievances, *DaimlerChrysler*, 288 F.3d at 443, and the court has recognized that "'[i]nformation related to the wages, benefits, hours, [and] working conditions' of unit employees is presumptively relevant." *Id.* (quoting *Country Ford*, 229 F.3d at 1191) (alteration in original).

Substantial evidence in the record supports the Board's finding that on October 5, 1998, in advance of the first arbitration over the employee discharges, the Union made a written request to Anheuser-Busch for information related to the use of hidden surveillance cameras, which is a term or condition of employment. After not receiving a complete response, the Union followed up with another letter on November 2, 1998. Although Anheuser-Busch provided the Union with information about the use of such cameras in Stockhouse 16, the record indicates that it failed to provide the requested information about surveillance in other areas of the workplace until over six months later. Because the Union had put Anheuser-Busch on notice that it desired information relevant to a mandatory subject of bargaining, it was under no obligation to make continued requests, and thus cannot be said to have abandoned its request in the face of Anheuser-Busch's resistance. Anheuser-Busch's suggestion that the Board's determination is inconsistent with the reality of information exchanges that occur prior to arbitration proceedings ignores that this information relates to a term or condition of employment and therefore is presumptively relevant regardless of the context in which the request arose. *See DaimlerChrysler*, 288 F.3d at 443. The Board therefore did

not need to determine whether the information request was relevant to the particular arbitration. Furthermore, the employer's obligation is to provide relevant information upon request, and thus, contrary to Anheuser-Busch's contention, it is not something over which the employer may opt to bargain during an arbitration, *see, e.g.*, *Crowley Marine*, 234 F.3d at 1297; *Country Ford*, 229 F.3d at 1191-92. Because Anheuser-Busch's resistance to providing the Union with information related to a term or condition of employment, the Board properly determined that its actions were contrary to its duty to bargain in good faith and therefore violated the Act.

## III.

Although in agreement with the Board's determination that Anheuser-Busch violated section 8(a)(5) and (1), the Union challenges the Board's failure to order a make-whole remedy for the disciplined employees. In evaluating the Board's chosen remedy, the court "give[s] great deference to [its] selection." *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1120 (D.C. Cir. 1994); *see also Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 194 (1941). As the court has stated, "The Act does not require the Board to 'order that which a complaining party may regard as "complete relief" for every unfair labor practice.'" *Teamsters Local Union No. 639 v. NLRB*, 924 F.2d 1078, 1085 (D.C. Cir. 1991) (quoting *Shepard v. NLRB*, 459 U.S. 344, 352 (1983)). Rather, "[a] party challenging the Board's choice of remedy must show that the remedy is 'clearly inadequate in light of the findings of the Board.'" *Id.* (quoting *Int'l Union of Elec. Workers v. NLRB*, 434 F.2d 473, 478 (D.C. Cir. 1970). The court will not enforce the Board's remedial order, however, when it fails to distinguish adequately its applicable precedent. *See, e.g.*, *Gen. Elec. Co. v. NLRB*, 117 F.3d 627, 636 (D.C. Cir. 1997); *Avecor, Inc. v. NLRB*, 931 F.2d 924, 933 (D.C. Cir. 1991); *cf. DaimlerChrysler*, 288 F.3d at 445.

In an effort to remedy Anheuser-Busch's unfair labor practices, the Board entered a cease-and-desist order, ordered it to bargain over hidden surveillance upon request, and required it to post remedial notices. However, relying on section 10(c) of the Act, a majority of the Board refused to order make-whole relief for the sixteen disciplined employees because there was "an insufficient nexus in the instant case between [Anheuser-Busch's] unlawful installation and use of the cameras and the employees' misconduct." *Anheuser-Busch*, 342 N.L.R.B. No. 49, slip op. at 2. Section 10(c) "delegate[s] to the Board the primary responsibility for making remedial decisions that best effectuate the policies of the Act." *ABF Freight Sys., Inc. v. NLRB*, 510 U.S. 317, 323-24 (1994). However, that section also provides, as relevant, "No order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay, if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c).

Section 10(c) does not expressly address whether the Board shall or shall not deny make-whole relief where an employer would not have discovered its employees' misconduct but-for its own unlawful action. As the Seventh Circuit has observed, "[T]he proviso [in § 10(c)] does not prevent the Board from insisting that the employer [prove 'cause'] without using the 'fruit' of the violation. . . . Section 10(c) does not speak to burdens of persuasion, fruits of violations, exclusionary rules, and the other paraphernalia of trials and inferences." *Communication Workers v. NLRB*, 784 F.2d 847, 851 (7th Cir. 1986); *cf. NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 401 n.6 (1983). The Board, of course, "may fill interstices with a reasoned approach." *Communication Workers*, 784 F.2d at 851; *see also Beth Israel Hosp. v. NLRB*, 437 U.S. 483, 501 (1978); *BPH & Co., Inc. v. NLRB*, 333 F.3d 213, 222 (D.C. Cir. 2003). Here, however, the Board has not adopted a reasoned approach

because it has failed to distinguish adequately its prior decisions.

In *Tocco, Inc.*, 323 N.L.R.B. 480 (1997), the Board ordered make-whole relief for employees who were discharged for drug use after the employer unilaterally changed its drug testing policy. The Board majority has attempted to distinguish *Tocco* by maintaining that it involved a unilateral change "to the very policy under which the employees were discharged," *Anheuser-Busch*, 342 N.L.R.B. No. 49, at slip op. 2, whereas here "the rules that the employees violated were unaltered and preexisting," *id*. As the dissenting Board member correctly concluded, this purported distinction ignores that the employer in *Tocco* did not alter its underlying drug use policy. Instead, the employer unilaterally changed from testing employees only for cause as determined by evidence of possession or use of drugs by a specific employee to a policy of determining cause based on overall safety, efficiency, and production records. *Tocco*, 323 N.L.R.B. at 489. This unilateral change resulted in the testing of all employees. *Id*. Similarly, in the instant case, the employer did not alter its underlying conduct rules, but instead unilaterally instituted a new means for detecting violations of a preexisting standard of conduct. In both cases, the employer would not have discovered the employees' misconduct but-for its unlawful unilateral change. Consequently, the Board's purported distinction between the cases fails, and the Board has treated like situations differently.

Furthermore, in *Great Western Produce, Inc.*, 299 N.L.R.B. 1004 (1990), the Board ruled that the unilateral implementation of certain work rules, including a record-keeping system that tracked employees' shortcomings, violated section 8(a)(5). The Board, after noting that it traditionally orders make-whole relief "where an employee's loss stems directly from the [employer's] unfair labor practice," stated that an "employer may avoid having to reinstate and pay backpay to an employee discharged

pursuant to an unlawfully instituted rule or policy if the employer demonstrates that it would have discharged the employee even absent that rule or policy." *Id.* at 1006. Contrary to the view of the Board majority, *Great Western* applied this remedial rule not just where the employer discharged employees for violating substantive rules that were unlawfully changed but also where the employer's unlawful work rule allowed it to discover grounds for an employee's discharge. For example, in *Great Western*, one of the unlawful unilateral changes was the employer's establishment of employee warning reports that chronicled performance and conduct and that served as a basis for discipline over time. The Board ordered reinstatement with backpay where the employer's "unilaterally instituted recordkeeping system contributed to his supervisor's knowledge of his excessive tardiness and absenteeism," *id.*, which were the substantive violations that led to discharge, because the employer "[did] not assert any basis independent of the unlawfully imposed employee warning reports for [the employee's] termination," *id.* at 1007 n.13. Where the employer "had a source of knowledge about [another employee's unsatisfactory performance] independent of the unlawful employee warning reports," the Board refused to order reinstatement and backpay. *Id.* at 1007.

Here, as in *Great Western*, and unlike *Taracorp Industries, Inc.*, 273 N.L.R.B. 221 (1984), upon which the Board principally relied, Anheuser-Busch does not assert a source of knowledge of the employee's misconduct independent of the unlawful change in the manner that it monitors and tracks its employees' activities. That the employees confessed during the investigatory interview is irrelevant because there is no record evidence that Anheuser-Busch relied on those statements to discipline the employees or that they would have been subject to investigatory interviews absent the misconduct discovered on the videotape footage. Thus, the refusal of the Board majority

to order reinstatement here cannot be enforced because it also is inconsistent with its approach in *Great Western*.

Despite the shortcomings of the remedial aspect of the Board's Decision, it remains for the Board to determine, based on policies consistent with the Act, whether reinstatement is not appropriate here because an exclusionary rule would improperly "reward [employees] who engage[] in unprotected conduct." *Anheuser-Busch*, 342 N.L.R.B. No. 49, slip op. at 2. The Supreme Court stated when the Act was in its infancy that "[i]n the exercise of its informed discretion the Board may find that effectuation of the Act's policies may or may not require reinstatement. We have no warrant for speculating on matters of fact the determination of which Congress has entrusted to the Board." *Phelps Dodge*, 313 U.S. at 195-96. Because the Board failed to distinguish adequately its prior decisions that support ordering make-whole relief, a remand is necessary so the Board can apply, distinguish adequately, or overrule those precedents.

Accordingly, we deny Anheuser-Busch's petition, grant the Union's petition, and remand the case for the Board to address the appropriate remedial order for the disciplined employees. We note that while the Board's Order refers twice to "surveillance cameras," *Anheuser-Busch*, 342 N.L.R.B. No. 49, slip op. at 10, its Decision is plainly limited to "hidden surveillance cameras," *id.* at 1, and, on remand, the Order should be corrected to reflect that fact.

SENTELLE, *Circuit Judge*, *dissenting in part*: I am completely in concurrence with the Court's opinion denying Anheuser-Busch's petition. I cannot concur in that portion of the opinion which grants the petition of the union.

To recap briefly what is well set forth in the opinion in the majority, Anheuser-Busch disciplined sixteen employees. It discharged five for violating the company's drug use policy (and by all appearances, the drug laws of the state of Missouri and possibly the United States). It entered last-chance agreements with seven employees for leaving assigned work areas for extended periods, sleeping on the job, and urinating on the roof of the brewhouse. It suspended four for leaving assigned work areas for extended periods. The Board, quite expectedly, approved this course of discipline. It did so acting under the authority of section 10(c) of the National Labor Relations Act ("the Act"), 29 U.S.C. § 160(c). That section provides, in pertinent part, "no order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any backpay, if such individual was suspended or discharged for cause." The employees whose status is at issue in the union's petition were discharged or suspended for cause. The Board's order, in perfect compliance with the statute, did not require reinstatement. The Court holds this error.

My understanding of the role of the court in the application of a statute, and specifically in the review of statutory application by federal agencies, is that: "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43 (1984). That should be the end of the matter. We have no need for legislative history, *Chevron* step 2, or any other tools. The plain

language of the statute is unambiguous. The Board followed that plain and unambiguous language. I would deny the petition.

The majority quotes from a Seventh Circuit decision, *Communication Workers of Am. v. NLRB*, 784 F.2d 847, 851 (7th Cir. 1986), to the effect that "[s]ection 10(c) does not speak to burdens of persuasion, fruits of violations, exclusionary rules, and the other paraphernalia of trials and inferences." This is correct. It does not. It says, absolutely and unqualifiedly, that "[n]o order of the Board shall require the reinstatement of any individual as an employee who has been suspended or discharged, or the payment to him of any back pay if such individual was suspended or discharged for cause." 29 U.S.C. § 160(c). The employees in the order at issue before us were reinstated with backpay by reason of their having been discharged for cause. The statute plainly covers the circumstance. The statute does not say that this statute shall not apply where a court can think of a methodology that derails the truth-seeking function of the hearing in such a fashion as to require everyone involved to pretend that the employees did not commit the misconduct in order to keep these sections from applying.

I would perhaps be able to better accept the majority's reasoning if it were offered in support of a *Chevron* analysis upholding a decision the Board had made. Here, where it is used solely for the purpose of reversing a decision that the Board has made, it seems to me wholly inappropriate.

In short, the language of the statute is clear. There is nothing in legislative history or in Supreme Court decisions compelling or even counseling a departure from that plain language. The Board was correct. I would deny the union's petition.