# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 12, 2018   Decided August 3, 2018

No. 16-1405

ADVANCED LIFE SYSTEMS INC.,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

Consolidated with 16-1450

On Petitions for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

*Gary E. Lofland* argued the cause and filed the briefs for petitioner.

*David A. Seid*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, General Counsel at the time the brief was filed, *Jennifer Abruzzo*, Deputy General Counsel at the time the brief was filed, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*, Supervisory Attorney.

Before:  KAVANAUGH∗ and MILLETT, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  Unfair if you do; unfair if you don't.  As a practical matter, that is the position in which the National Labor Relations Board's decision in this case left the employer.  Advanced Life Systems, a family owned-and-operated small business, found itself whipsawed between Board precedent that, on the one hand, forbids employers to *make* pay increases and holiday gifts without first negotiating with the union, and, on the other, generally forbids employers to *stop making* increases and holiday gifts after a union's election.  We hold that two statements by the company's owner constitute unfair labor practices, but the Board's ruling that the employer's suspension of personal gifts and discretionary pay raises was unlawful is not supported by substantial evidence.

# I

## A

The National Labor Relations Act, 29 U.S.C. § 151 *et seq.,* protects the right of employees to "bargain collectively through representatives of their own choosing."  *Id.* § 157.  The Act enforces that right by proscribing certain "unfair labor practice[s]," *id.* § 158(a), including any employer action that "interfere[s] with, restrain[s], or coerce[s] employees in the exercise" of that right to collective bargaining, *id.* § 158(a)(1).  The Act also shields employees from discriminatory employer

---

∗ Judge Kavanaugh was a member of this panel at the time the case was argued, but did not participate in this opinion.

actions designed to punish or deter union participation and membership. *See id.* § 158(a)(3).

Once employees exercise their Section 7 rights and elect a union to represent them, the Act makes it an unfair labor practice for employers "to refuse to bargain collectively with th[ose] representatives" on issues regarding "wages, hours, and other terms and conditions of employment." 29 U.S.C. § 158(a)(5), (d). In other words, the Act imposes on covered employers an affirmative duty to bargain over the terms and conditions of employment. *See Local Union No. 189, Amalgamated Meat Cutters, and Butcher Workmen of N. America, AFL-CIO v. Jewel Tea Co.*, 381 U.S. 676, 685–686 (1965). Correspondingly, the Act forbids employers to make unilateral changes to those employment matters for which bargaining is mandatory. *See NLRB v. United States Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993).

**B**

Advanced Life Systems, Inc. provides ambulance services in Yakima, Washington. *See Advanced Life Sys., Inc.*, 364 NLRB No. 117 at 13 (2016). William Woodcock is Advanced Life's majority owner and operator. Woodcock's immediate family members co-own the business, but only Woodcock controlled the company and its operations. Advanced Life began operations in 1996 and has grown over the intervening years to operate six ambulance stations and employ around fifty-five personnel, comprising a mix of Emergency Medical Technicians ("EMTs"), paramedics, dispatchers, and administrative and management staff.

Given its size, Advanced Life never adopted a formalized wage schedule or written policy. *Advanced Life Sys.*, 364 NLRB at 13. New hires were reportedly told that they could

expect periodic pay raises on, for example, the anniversary of their hire date. But those informal predictions rarely, if ever, materialized. *Id.*; *see id.* at 3 n.8. In practice, pay increases occurred at highly irregular intervals, varying between 2 weeks and 22.5 months. *Id.* at 7–9 (Member Miscimarra, dissenting). The amount of any pay raise, even for the same employee, was equally unpredictable, with per hour increases ranging between 25 cents and $2.50. *Id.* at 14. The record reveals no discernible nexus between, on one hand, the timing or amount of any pay raises and, on the other hand, any consistent or predictable metric like seniority or advanced training. Rather, Woodcock exercised unbridled discretion over the timing and amount of each individual's pay increase (if any). *Id.* at 13 n.8.

Similarly, Advanced Life lacked any formal bonus policy or standardized gift practice. *Advanced Life Sys.*, 364 NLRB at 14. In 1996, the company's first year of operations, the Woodcock family hosted a Christmas potluck for all Advanced Life employees at one of the ambulance stations and distributed personal gifts to each employee. *Id.* at 14; ALJ Hr'g Tr. 83:7, *In re: Advanced Life Systems, Inc., and International Ass'n of EMTs and Paramedics*, No. 19-CA-096464 (NRLB ALJ Feb. 25, 2014).

As the company grew, the potluck grew into an annual Christmas party at which Woodcock and his wife distributed assorted gifts and prizes to their employees, including everything from raffle tickets and gift cards to cash, appliances, and trips. *Advanced Life Sys.*, 364 NLRB at 14. Those gifts were all paid for by the Woodcocks out of their personal funds. *Id.* at 14 n.21, 15; *see also id.* at 16. Advanced Life continued this holiday practice until 2011, with one exception. In 2010, in lieu of gifts, the Woodcocks donated approximately $10,000 to an employee whose home was destroyed in a mudslide.

Neither the Woodcocks nor Advanced Life kept any records of the gifts given to employees. *Advanced Life Sys.*, 364 NLRB at 14 n.21, 15. Since the Woodcocks paid for the gifts entirely from their personal funds, they never claimed a tax deduction nor sought other favorable treatment for those expenditures. The employees, for their part, never claimed the gifts as wages nor reported them on their income taxes.

In July 2012, the now-defunct National Emergency Medical Services Association ("Union") began an organizing campaign among Advanced Life's paramedics, EMTs, and dispatchers. During the organization campaign, one of the unit employees, Matthew Schauer, talked with Woodcock about the "pros and cons" of unionization. ALJ Hr'g Tr. 74:20. In testimony that the Board credited, Schauer reported Woodcock as saying that Advanced Life "would not be able to give us raises if we brought a union in." *Id.* at 27:1.

Shortly after that, the Union won the representation election, and the Board certified it as the unit's exclusive collective-bargaining representative. Following the Union's election, Advanced Life discontinued pay raises and the Christmas party and gifts pending negotiation of those matters with the Union.

Four months later, in December 2012, Lenny Ugaitafa, a bargaining unit employee, inquired about a pay raise. Woodcock explained that his attorney had advised him to temporarily freeze all changes in the employees' terms and conditions of employment, including pay raises, "because of the whole Union deal." ALJ Hr'g Tr. 65:15.

The next month, another unit employee, Cole Gravel, asked Woodcock why Advanced Life had not made any pay raises in the five months since the employees had unionized.

Woodcock replied that, because pay raises had been discretionary prior to the election, Advanced Life was now legally obligated to negotiate any change in pay with the Union. *Advanced Life Sys.*, 364 NLRB at 2.

## C

The International Association of EMTs and Paramedics, a labor organization affiliated with the Union, filed two unfair labor practice charges against Advanced Life in January 2013. Then-Acting General Counsel Lafe Solomon issued an order consolidating the cases and complaints. General Counsel Richard Griffin subsequently ratified the consolidated complaint and, after independently reviewing the merits, authorized continued prosecution of the matter.

The General Counsel's complaint alleged that Advanced Life violated Section 8 of the Act, 29 U.S.C. § 158, by (i) "withholding regularly scheduled biannual wage increases;" (ii) "failing to provide employees with Christmas bonuses;" (iii) "telling employees that wage increases were withheld because of their union activity[;]" and (iv) "discriminating in regard to the hiring, tenure or terms and conditions of employment of its employees" to discourage union and concerted activities. *Advanced Life Sys.*, 364 NLRB at 13.

After a hearing, a Board administrative law judge concluded that Woodcock's three statements made to employees about halting wage increases after unionization violated Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), because they were designed to discourage the exercise of the employees' Section 7 collective action rights, 29 U.S.C. § 157. The administrative law judge also found that Advanced Life "had a longstanding practice of granting hourly wage increases mainly between 25 to 50 cents once every 6 months or sooner,

depending on tenure and performance[,]" and that its unilateral cessation of pay raises and Christmas bonuses violated Section 8(a)(5) of the Act, which prohibits changing the terms and conditions of employment without bargaining, 29 U.S.C. § 158(a)(5). *Advanced Life Sys.*, 364 NLRB at 15. Lastly, the administrative law judge ruled that Advanced Life's decision to halt wage increases and Christmas gifts pending negotiations with the Union constituted anti-union retaliation in violation of Section 8(a)(3), 29 U.S.C. § 158(a)(3), as evidenced by Woodcock's contemporaneous statements. *Advanced Life Sys.*, 364 NLRB at 18.

The Board affirmed most of the administrative law judge's findings and rulings, concluding that Advanced Life was liable for two violations of Section 8(a)(1) based on Woodcock's statements immediately before and four months after the election that tied the temporary halt in wage increases to the need to negotiate with the Union. *Advanced Life Sys.*, 364 NLRB at 2. The Board also found two violations of Section 8(a)(3) for discriminatorily ceasing pay raises and Christmas bonuses following the election, and one violation of Section 8(a)(5) for unilaterally changing the employees' wages by halting the Christmas gifts. *Id.* at 3–4.

The Board also supplemented the remedial order to include back pay plus interest for the Section 8(a)(3) violations and required Advanced Life to offset any adverse tax consequences arising from a lump-sum of back pay. *Advanced Life Sys.*, 364 NLRB at 4. The Board specifically declined to pass upon whether the pay raise freeze violated Section 8(a)(5), and whether Woodcock's January 2013 statement interfered with, restrained, or coerced employees in the exercise of their rights, in violation of Section 8(a)(1). *Id.* at 2 n.5, 3–4 & n.8.

Advanced Life petitioned for review of the Board's order, and the Board filed a cross-application for enforcement.

## II

We have jurisdiction to review the Board's decision under 29 U.S.C. § 160(e) and (f). In so doing, we will uphold the Board's decision if its ruling is not arbitrary, capricious, or founded on an erroneous application of the law, and if its factual findings are supported by substantial evidence. 29 U.S.C. § 160(e); *Stephens Media, LLC v. NLRB*, 677 F.3d 1241, 1250 (D.C. Cir. 2012).

But we will not "merely rubber-stamp NLRB decisions." *Tradesmen Int'l, Inc. v. NLRB*, 275 F.3d 1137, 1141 (D.C. Cir. 2002) (quoting *Douglas Foods Corp. v. NLRB*, 251 F.3d 1056, 1062 (D.C. Cir. 2001)). "[O]ur review 'must take into account whatever in the record fairly detracts from the weight' of the evidence cited by the Board to support its conclusions." *Dover Energy, Inc. v. NLRB*, 818 F.3d 725, 729 (D.C. Cir. 2016) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

## III

### A

At the outset, Advanced Life argues that the initial complaint issued by then-Acting General Counsel Lafe Solomon was void because Solomon was not lawfully serving in that position. In *NLRB v. SW General, Inc.*, 137 S. Ct. 929 (2017), the Supreme Court held that Solomon's continued service in an acting capacity after the President nominated him to the full-time General Counsel position violated the Federal Vacancies Reform Act of 1998 ("Vacancies Act"), 5 U.S.C.

§ 3345 *et seq.*, *see SW General*, 137 S. Ct. at 944. Solomon's invalid tenure included the time during which the complaint was first issued against Advanced Life.

Advanced Life failed to raise that Vacancies Act argument before the Board. That failure to exhaust the claim strips this court of jurisdiction to decide it, absent "extraordinary circumstances." 29 U.S.C. § 160(e); *see Woelke & Romero Framing, Inc. v. NLRB*, 456 U.S. 645, 666 (1982). No extraordinary circumstances exist here that would excuse Advanced Life's procedural neglect of its Vacancies Act claim.

**B**

The Board found that Advanced Life twice violated Section 8(a)(1) based on statements Woodcock made connecting the freeze on pay raises with the Union's arrival—one shortly before the representation election and another four months after. Advanced Life has not challenged the violation based on the post-election statement in either its opening or reply briefs. So the Board is entitled to summary enforcement of that uncontested portion of its order. *See Allied Mech. Servs. v. NLRB*, 668 F.3d 758, 765 (D.C. Cir. 2012).[1]

---

[1] The Board declined to pass upon the administrative law judge's finding of a Section 8(a)(1) violation arising out of Woodcock's January 2013 statement explaining to employee Gravel that pay raises, which had previously been within his discretion to grant, now had to be negotiated with the Union as a mandatory subject of bargaining. *Advanced Life Sys.*, 364 NLRB at 2 n.5. Accordingly, that charge is not before us. But because the Board explicitly predicated its declination on the immateriality of an additional Section 8(a)(1) violation to the ultimate remedy, *id.* at 2 n.5, remand of that issue would be futile.

The only question before us, then, is whether the Board reasonably grounded a Section 8(a)(1) violation in Woodcock's statement to employee Schauer, in the weeks leading up to the election, that he "would not be able to give [the employees] raises if [they] brought a union in." *Advanced Life Sys.*, 364 NLRB at 2; ALJ Hr'g Tr. 26:25–27:1. A Section 8(a)(1) violation occurs when, considering all of the surrounding circumstances, the employer's conduct reasonably tended to interfere with an employee's exercise of her Section 7 collective action rights. *Tasty Baking Co. v. NLRB*, 254 F.3d 114, 124 (D.C. Cir. 2001). The inquiry is objective. *Dover Energy*, 818 F.3d at 729. Neither the employer's intent to interfere nor actual coercion of the employee needs to be proven. *United Servs. Auto. Ass'n v. NLRB*, 387 F.3d 908, 913 (D.C. Cir. 2004); *see Raymond Interior Sys., Inc. v. NLRB*, 812 F.3d 168, 179 (D.C. Cir. 2016). Instead, whether an employer's conduct trenches upon Section 7 rights turns on how a reasonable employee would have understood the action. *See Dover Energy*, 818 F.3d at 729–730. In applying that test, we "recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship." *Progressive Elec., Inc. v. NLRB*, 453 F.3d 538, 544 (D.C. Cir. 2006).

Advanced Life does not claim that the Board committed legal error in the test that it applied. And Advanced Life admits that Woodcock and Schauer had a conversation about the effect of unionization on the company's relations with its employees. Advanced Life just factually disputes the precise content of Woodcock's statement. According to Advanced Life, Woodcock only said that without the Union, employment issues could be expeditiously resolved between management and employees, but unionization would require negotiating

with the Union "a lot of the things that [Advanced Life] normally did day to day[.]" ALJ Hr'g Tr. 74:23, 74:25–75:1.

So this issue boils down to a credibility determination between Schauer's and Woodcock's versions of his statement. The problem for Advanced Life is that we will not reverse the Board's credibility determination unless it was "hopelessly incredible, self-contradictory, or patently unsupportable." *Shamrock Foods Co. v. NLRB*, 346 F.3d 1130, 1134 (D.C. Cir. 2003). Advanced Life points to nothing in the record that meets that high mark. The Board faced a binary choice and had to credit one set of testimony over the other. To be sure, the Board had reason to be suspicious of Schauer's testimony, given that Schauer disclaimed remembering "all the specifics" of his conversation with Woodcock yet "specifically remember[ed]" the precise wording of Woodcock's comment. ALJ Hr'g. Tr. 26:24–25. But that is not enough for us to say that the Board's decision to credit Schauer was patently unsupportable.

Once credited, the statement expressly linking a cessation in pay increases to the advent of the Union could reasonably be understood by the employee to restrain or sanction his exercise of his Section 7 right to organize. *See Acme Die Casting v. NLRB*, 26 F.3d 162, 164 (D.C. Cir. 1994) (Section 8(a)(1) violation obtained where supervisor stated "I told you guys not to bother with the Union because that was going to happen, no raise."); *Southwire Co. v. NLRB*, 820 F.2d 453, 457 (D.C. Cir. 1987) (employer statements that "unionization would result in lower wages and loss of benefits" violated Section 8(a)(1)).

For those reasons, we grant the Board's cross-application for enforcement as to the portion of its order ruling that Advanced Life violated Section 8(a)(1) of the Act based on

Woodcock's statements shortly before and four months after the representation election.

## C

The Board also found that Advanced Life twice discriminated against its employees for choosing the Union, in violation of Section 8(a)(3), 29 U.S.C. § 158(a)(3): First, by temporarily discontinuing its irregular pay increases pending negotiations with the Union, and second, for stopping the Christmas gifts in December 2012 in advance of Union bargaining. *Advanced Life Sys.*, 364 NLRB at 2–3. The administrative law judge found that the same two practices also violated Section 8(a)(5), 29 U.S.C. § 158(a)(5), because Advanced Life failed to negotiate those changes in employment terms with the Union. *Id.* at 15–17. The Board, however, did not address the finding of a Section 8(a)(5) violation concerning the pay increases. *Id.* at 3 n.8. Instead, the Board explicitly limited the Section 8(a)(5) determination to the Christmas gifts.

The Board's selective affirmance highlights the tightrope the Board had to walk to establish an unfair labor practice in this case. As a general rule, employers may *not* make pay increases or award bonuses to represented employees without first negotiating their terms with the union. Indeed, unilaterally instituting such payments would be an unfair labor practice, in violation of an employer's Section 8(a)(5) duty to bargain with the employees' chosen union over the terms and conditions of employment, 29 U.S.C. § 158(a)(5). *See NLRB v. Katz*, 369 U.S. 736, 743 (1962); *Consolidated Commc'n, Inc. v. NLRB*, 837 F.3d 1, 19–20 (D.C. Cir. 2016). The starting assumption, then, was that Section 8(a)(5) required Advanced Life to freeze pay increases and holiday gifts until it could negotiate them with the Union.

13

But an exception exists.  If the employer has a "long-standing practice" of awarding the same "automatic increases" or bonuses, *Katz*, 369 U.S. at 746, at "fixed" and "regular intervals," *Acme Die Casting v. NLRB*, 93 F.3d 854, 856–857 (D.C. Cir. 1996), the continuation of those payments is permitted.  More than that, the failure to continue making the payments could be construed as evidence of discrimination against the employees' exercise of their unionization right, which is itself an unfair labor practice under Section 8(a)(3), 29 U.S.C. § 158(a)(3).  *See Katz*, 369 U.S. at 746.

To pay, or not to pay:  that is the question that Advanced Life faced once the employees unionized.[2]  And the answer turned entirely on whether its past pay increases and Christmas gifts documented a longstanding practice of automatically paying predictable amounts at known intervals.  If they did, not paying could be an unfair practice; if they did not fit that pattern, paying would be an unfair practice.

Applying that rubric, the Board found that Advanced Life had a fixed and determinate practice of pay increases and holiday gifts, and that it committed an unfair labor practice by halting the payments after unionization.  We vacate that decision because the Board's finding that Advanced Life had such an established payment practice is not grounded in substantial evidence, and no other record evidence substantially supported its finding of discrimination.

**1**

At the outset, the Board argues that Advanced Life waived its challenge to the Section 8(a)(3) violations.  That is incorrect.

---

[2] *See* WILLIAM SHAKESPEARE, HAMLET, act 3, sc 1.

14

Advanced Life (i) listed the Board's Section 8(a)(3) rulings in its statement of the issues before this court, and (ii) directly attacked the factual and legal underpinnings necessary to sustain the Section 8(a)(3) violation based on the withheld pay raises. What the Board's argument overlooks is that the same facts and arguments about the character of Advanced Life's past pay increases and Christmas gifts are dispositive of both the Section 8(a)(3) and (a)(5) inquiries. That is because they are mirror inquiries: If the timing or amount of Advanced Life's past pay raises and gifts were anything less than automatic, Section 8(a)(5) precluded Advanced Life from making any further payments pending negotiations with the Union. If they were automatic, then Section 8(a)(3) required Advanced Life to make those payments and its failure to do so evidenced anti-union animus. Because the Board found no Section 8(a)(5) violation involving the withheld pay raises, the only purpose of Advanced Life's arguments about the irregularity of its pay increases was to attack the Board's finding of Section 8(a)(3) violations.

In sum, Advanced Life adequately addressed the operative facts and legal theories governing the findings of Section 8(a)(3) violations. That suffices to bring the issue before us. *See Stephens Media*, 677 F.3d at 1250–1251 (explaining that we will consider any contested findings of the Board); *cf. Allied Mech.*, 668 F.3d at 765 (summarily enforcing only those portions of Board's order that the petitioner abandoned or failed to contest).

**2**

Unlike Section 8(a)(1), violations of Section 8(a)(3) require proof of the employer's motive or animus. Specifically, to establish that an employer has discriminated against its employees' exercise of their Section 7 right to

collective activity, the General Counsel must show that an employer took adverse action against an employee, "at least in part," *because of* that employee's union involvement. *Matson Terminals, Inc. v. NLRB*, 114 F.3d 300, 303 (D.C. Cir. 1997); *see Arc Bridges, Inc. v. NLRB*, 861 F.3d 193, 198–199 (D.C. Cir. 2017). To establish a *prima facie* case of discriminatory motivation, the General Counsel must show that the employer knew of the employee's union activity and acted in response to it. *See Wright Line*, 251 NLRB 1083, 1089 (1980)*, enforced*, 662 F.2d 899 (1st Cir. 1981); *see also NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 401–403 (1983) (approving *Wright Line* test), *overruled in part on other grounds by Department of Labor v. Greenwich Collieries*, 512 U.S. 267, 276–278 (1994); *LCF, Inc. v. NLRB*, 129 F.3d 1276, 1281 (D.C. Cir. 1997) (employing *Wright Line* burden shifting).

Substantial evidence of the required discriminatory motive is missing here. That is because the essential predicate of the General Counsel's claim—that Advanced Life had the type of well-established and automatic practice of paying fixed amounts at predetermined intervals that would allow continued payment without violating Section 8(a)(5)'s duty to bargain—is missing. *Katz* requires that past wage increases present a recognizable pattern establishing who will receive a raise, when it will occur, and how much that raise will be. *See* 369 U.S. at 746–747.

Yet the record in this case shows that the pay increases were irregular in their timing and unsystematic in their amounts. When raises occurred, they could come at intervals as short as two weeks or as long as 22.5 months. Even discarding the most extreme data points, the record showed that three employees received raises two weeks apart, six received raises one month apart, four were at 1.5 months, six at two months, five at 2.5 months, fourteen at three months, ten at 3.5

months, eight at four months, eighteen at 4.5 months, ten at five months, and twenty-nine at 5.5 months.

The amount of each increase was just as uneven and unpredictable, ranging from 25 cents, to 50 cents, to $1.00, to $2.50 per hour.  And nothing in the record tied those disparities to identifiable or predictable metrics, like evaluations, time in service, or advanced training.  *Cf. Advanced Life Sys.*, 364 NLRB at 14 n.13 (noting that a multiplicity of unpredictable factors could influence Woodcock's discretion to award raises, including "the availability of employees, the economy, company expenses, call volumes, and reimbursement rates").

The General Counsel's own evidence, which was drawn from three employees, proves the point.  Cole Gravel received incremental hourly increases of $1.00, $0.50, $0.50, $0.50, $1.50, $0.50, $0.50, and $0.25.  Lenny Ugaitafa's raises came in amounts of $0.50, $0.50, and $1.00 per hour.  And Matthew Schauer received $0.50, $1.00, $0.50, $0.25, $0.25, $0.25, and $0.25 increases to his hourly rate.  Nothing in the record reveals any rhyme or reason for the differing amounts other than Woodcock's exercise of his sole discretion.

In short, on this record, the only discernible constant is the inconstancy of both the timing and amount of pay increases.

Apparently lumping the numbers together, the administrative law judge divined that, on average, 25 to 50 cent raises occurred "once every 6 months or sooner[.]" *Advanced Life Sys.*, 364 NLRB at 15.  That paints the bullseye around the arrow.  The question under *Katz* is not whether numbers could be averaged in hindsight, but whether a "long-standing" practice of predetermined payments to individual employees was so ingrained in the workplace as to lead to "automatic wage increases" for individual employees.  *Katz*, 369 U.S. at 746; *see*

*Daily News of Los Angeles v. NLRB*, 73 F.3d 406, 412 n.3 (D.C. Cir. 1996) (expressing doubt that simply awarding pay raises at fixed intervals would alone be sufficient to bring them within the *Katz* exception); *Acme Die Casting*, 93 F.3d at 857 (finding that discretion over timing *or* amount will exclude past raises from the existing terms and conditions of employment).

As for the administrative law judge's numbers, no individual employee could have felt assured of any such increase anywhere within that timeframe. Nor were those increases locked-in going forward. Even the administrative law judge acknowledged that the timing and amount of each raise, including those falling within the purported pattern, depended on discretionary variables like performance. *Advanced Life Sys.*, 364 NLRB at 15. Perhaps that is why the Board abandoned the administrative law judge's perceived pattern. *See id.* at 3 n.8.

Because pay increases were "in no sense automatic, but [] informed by a large measure of discretion," Advanced Life could not implement them unilaterally and, instead, Section 8(a)(5) required it to negotiate "the procedures and criteria for determining such increases." *Katz*, 369 U.S. at 746; *see also Daily News*, 73 F.3d at 412 n.3 ("[If] the Company retained total discretion to grant the increases based on any factors it chose, [a unilateral change] would [not] have resulted in a violation of section 8(a)(5) even though the raises had been awarded annually[.]"). For that reason, Advanced Life's declination to make the pay increases—a decision required by Section 8(a)(5)—cannot be treated as a violation of Section 8(a)(3).

For evidence of anti-union animus, the Board also points to Woodcock's statements (i) to Schauer before the election that Advanced Life would be unable able to give raises if the

employees unionized without negotiating, and (ii) to Ugaitafa that he could no longer give individual raises following the Union's election.

That is too thin a reed on which to hang a finding of anti-union animus. While the timing and context allowed the Board to find that the two statements violated Section 8(a)(1) based on how a reasonable employee would interpret them, without more they cannot be bootstrapped into evidence of actual discriminatory intent on Woodcock's part given the confusing questions of legality surrounding Advanced Life's ability (or not) to continue such payments. Under the circumstances, suspending pay increases could have equally evidenced the legally required respect for the employees' and the Union's bargaining rights.[3]

**D**

The Board likewise left Advanced Life in a Catch-22 over the Woodcocks' Christmas gifts: forbidden to pay them unilaterally by Section 8(a)(5), and compelled to keep paying them unilaterally by Section 8(a)(3). The Board found that Advanced Life had such an established practice of granting Christmas "payments" that they constituted a term and condition of employment, and so unilaterally discontinuing them after the Union was elected violated Section 8(a)(5). *Advanced Life Sys.*, 364 NLRB at 2–3. The Board further concluded that their temporary cessation pending negotiations

---

[3] Our holding that the pay raises were discretionary forecloses as a matter of law any finding that the decision to freeze them pending negotiations with the Union violated Section 8(a)(5), an issue the Board did not reach. Remand, therefore, would be futile. *See Katz*, 369 U.S. at 746–747.

reflected anti-union discrimination in violation of Section 8(a)(3).

Holiday bonuses may "become[] an element of wages and, therefore, a term and condition of employment that cannot be altered unilaterally if it is tied to other remuneration and paid regularly over an extended period." *Exxel/Atmos, Inc. v. NLRB*, 147 F.3d 972, 976–977 (D.C. Cir. 1998) (quotations omitted). The Board occasionally frames the inquiry in terms of employees' expectations. *See Philadelphia Coca-Cola Bottling Co.,* 340 NLRB 349, 353 (2003) (compiling cases), *enforced*, 112 F. App'x 65 (D.C. Cir. 2004) (per curiam). While employees' subjective expectations can be one relevant consideration, they cannot by themselves establish the type of long-term pattern of regularized payments needed to except awards from the employer's central duty to bargain with a union over terms of employment.

As with the pay increases, the record in this case lacks substantial evidence of a long pattern of regularized Christmas payments by Advanced Life that was tied to the employees' remuneration.

*First*, the testimony concerning Christmas gifts was far too sparse, inconsistent, and conflicting to establish any reliable pattern of payments, let alone one tied to the employees' remuneration. The General Counsel relied on evidence from just three employees, only two of whom received cash gifts rather than just a raffle ticket. Not only did the testimony of those two employees prove inconsistent with each other, but also one of the two witnesses who received a cash gift had his testimony on the Christmas gifts impeached by his own earlier sworn affidavit. *Advanced Life Sys.*, 364 NLRB at 14 n.22.

The remnants of unimpeached testimony concerning cash payments boiled down to one employee, Schauer, receiving a gift of $100 in 2011, and another employee, Gravel, receiving $100 in 2008 and $300 in 2011. That does not a mechanical and predictable pattern of payments make. It makes no pattern at all.

Schauer went on to testify that he was told by Advanced Life management that "EMTs [get] $50 for every year that we're there up to $500 and paramedics get $100 for every year that we're there up to $500 as well." ALJ Hr'g Tr. 32:7–9. That testimony contradicts Gravel's testimony—the only testimony concerning Christmas payments with an unimpeached sample size of more than one year. Under Schauer's proffered pattern, Gravel should have received $400 dollars in 2011.[4] But Gravel received only $300. The Board made no effort to reconcile that conflicting evidence and the unpredictability of gift amounts that it revealed. Nor did the Board point to any discernible linkage between gift amounts and remuneration as the law requires. *Exxel/Atmos*, 147 F.3d at 977.

Read as a whole, the record gets still worse for the Board. Rather than disclose a consistent, long-term pattern of foreordained bonuses, the record reveals that Gravel, alone, received a $100 payment in 2008. In 2009, Gravel received a Christmas check but could not recall the amount. In 2010, the employees received only a smattering of token raffle gifts because the Woodcocks chose instead to donate $10,000 to an employee whose home was destroyed in a mudslide. And in 2011, the only year where all three testifying employees

---

[4] If the pattern held true, Gravel would have received $100 in 2008, $200 in 2009, $300 in 2010 (donated to a fellow employee), and $400 in 2011.

received something of value, one of them received a $50 gift card to a coffee shop. That is the antithesis of a regularized and longstanding pattern of established holiday bonuses.

The Board contends that the Woodcocks had an enforceable practice of collectively disbursing cash and other items totaling between $10,000 and $15,000 each holiday season. But the Board had to find that Advanced Life had a longstanding pattern of making bonus payments calculable by reference to each recipient employee's remuneration. *Exxel/Atmos*, 147 F.3d at 976–977. The Board made no relevant finding that stripped the payments of their purely personal origin and motivation. In any event, the Board's reliance on a broad swath of dollar amounts—a range with an internal deviation of 50%—confesses its own inability to calculate with any confidence whether and how much any individual employee might expect.

*Second*, there were no payments made by *Advanced Life*. The Board glossed over the critical and undisputed fact that the Woodcocks paid for the Christmas gifts entirely out of their own pockets, not out of company funds. Neither the Woodcocks nor Advanced Life claimed those expenditures as tax deductions or any type of business expense. Nor did the Woodcocks and Advanced Life even maintain a record of the payments.

The Board simply imputed the payments to Advanced Life on the ground that Woodcock was the company's majority owner and the payments aimed to boost employee morale. Yet neither of those considerations turns personal gifts into business expenditures, let alone a formal component of employees' salaries or benefits. In ordering the retroactive payment of Christmas gifts, the Board also failed to grapple with the problem that (1) the Woodcocks are not parties to

either the administrative or judicial proceedings, and (2) no basis was found for piercing the corporate veil or imposing alter ego status, which is what would be needed to transmogrify the Woodcocks' personal gifts into salary payments by Advanced Life.

*Third*, the Board ignored that the employees themselves had never treated the gifts as salary or official bonuses. On this record, not one of them reported any of the Christmas payments as income on their federal or state taxes. The Board contends a company's tax treatment of monetary disbursals to employees is not dispositive of whether those payments are wages. *Cf. North Am. Pipe Corp.*, 347 NLRB 836, 840 (2006). That is true, but beside the point. The Board rested its finding of a violation of Section 8(a)(5) in no small part on how the employees subjectively understood the payments at issue. But the Board cannot rely selectively on those subjective views that support its position, while ignoring evidence about uniform employee understandings that point in the opposite direction. *See Carpenters and Millwrights, Local Union 2471 v. NLRB*, 481 F.3d 804, 809 (D.C. Cir. 2007) (Board must account for and reasonably explain evidence contrary to its findings).

*Fourth*, the Section 8(a)(1) statements about having to halt pay raises pending negotiations with the Union constitute the sole evidence upon which the Board based its animus finding. Yet neither of those statements makes any mention of the Christmas party or the Christmas gifts.

To sum up, the record overwhelmingly documents the personal, discretionary, and irregular nature of the Woodcocks' Christmas gifts, and the absence of any discernible link between their amount and the individual employee's remuneration (or any other relevant employment factor). No substantial evidence supports treating them as company wages

or bonuses. All the Board demonstrated here was that no good deed goes unpunished. That we will not uphold.

\* \* \* \* \*

The Board's finding that Woodcock's two statements, both of which were made proximate to the Union election and in his capacity as Advanced Life's owner and operator, violated Section 8(a)(1), 29 U.S.C. § 158(a)(1), is supported by substantial evidence. So for that claim, we deny Advanced Life's petition and we grant the Board's cross-application for enforcement. As to the Section 8(a)(3) and 8(a)(5) violations, 29 U.S.C. § 158(a)(3) and (5), we grant Advanced Life's petition, deny the cross-application for enforcement, and vacate those portions of the Board's decision.

*So ordered.*